## STRICKLAND *v.* THE STATE.

1. Upon the trial of an indictment for assault with intent to murder, alleged to have been committed with a knife, it was not error to refuse to charge: "If there be great superiority in physical strength of an assailant who strikes another a blow with his fist, or ill health in the assailed at the time, or other circumstances producing relatively great inequality between them in combat, the assailed can justifiably resent the blow by stabbing the assailant." The principle sought to be embodied in the request would not in any case be applicable unless the antagonist having the superior strength unlawfully assaulted the other, and even in that event, the jury, and not the judge,

should determine whether such assault could lawfully be defended by stabbing.

2. Although the written request as submitted was defective for the reasons above given and was therefore properly refused, yet inasmuch as, under the facts disclosed by the record, the question of inequality in physical strength was involved, and the sole defense relied upon as a justification for the stabbing was that the accused was physically unable to otherwise defend himself from the prosecutor's alleged unlawful assault upon him, the court erred in not giving in charge, even without a request, the principle which the request presented sought to express.

January 13, 1896.

Indictment for assault to murder.   Before Judge Reese. Madison superior court.   September term, 1895.

Strickland was indicted for assault with intent to murder, and was convicted of assault and battery.   His motion for a new trial was overruled, and he excepted.   He and Gholston were cousins.   Gholston was much the larger and stronger man, weighing about 230 pounds, while defendant weighed nearly 100 pounds less.   They were on opposite sides of a political contest being voted on, and the difficulty occurred at a polling precinct.   Gholston had sent certain of his employees to vote, and followed them to the place. Strickland came up with a crowd of negroes, and Gholston said to him, "I am mighty sorry [or damned sorry] to see you with a mob of negroes to try to beat the boys you were raised with."   Strickland replied, "You attend to your business, and I will attend to mine."   Gholston said, with an oath, that he was attending to his business, and added that he was damned sorry that he was any kin to Strickland. Strickland replied that he was equally sorry for that fact, walked off a few steps, and stated that he did not want any difficulty with Gholston, who asked, "Who in the hell said anything about a difficulty?"   He put his hand on Strickland's shoulder, and called him a "damned cowardly puppy."   Thereupon he was stabbed in the neck by Strickland.   He shoved Strickland to the ground, put his knee on him, and held down the hand which held the knife.   In

the struggle resulting in the fall, Gholston's coat was cut a number of times by Strickland's knife. After they went to the ground some of the bystanders pulled Gholston off, and as his hold was released, Strickland stabbed him twice in the bowels, saying, "I will cut your damned guts out." According to several witnesses, when Gholston first approached, Strickland warned him not to run on him, or he would hurt Gholston, who thereupon seized Strickland by the collar, rubbed his fist in Strickland's face, commanded him to put down that knife, and struck him; all of this preceding the first stab. There was also testimony that Strickland did not stab Gholston after he was pulled off. After the combatants were separated and Strickland was leaving, Gholston's son struck him on the shoulder with a large piece of wood, and Gholston himself followed this up with three stabs in Strickland's head, inflicted with a knife. The wounds on both parties were dangerous. Strickland had suffered from asthma for a number of years, etc.

The motion for a new trial alleges, that the verdict is contrary to law and evidence, and that the court erred in refusing to charge as requested: "That if there be great superiority in physical strength of an assailant who strikes another a blow with his fist, or ill health in the assailed at the time, or other circumstances producing relatively great inequality between them in combat, the assailed can justifiably resent the blow by stabbing the assailant. The general rule is, that whether the stabbing is in self-defense depends upon the nature and violence of the assault made on him who stabs."

*E. T. Brown* and *R. H. Kinnebrew*, for plaintiff in error.
*W. M. Howard, solicitor-general*, contra.

ATKINSON, Justice.

1. The request to charge, upon the refusal of which error was assigned, was defective for two reasons: It left entirely out of consideration the question as to whether or

not the assault was lawful.    Whatever may have been the relative difference in size, if the smaller person offer to the larger such an insult as justifies a battery, and a battery not ·disproportioned to the offense given be committed, the person assailed cannot justify upon such provocation the use of a deadly weapon, nor can the person assailed under any circumstances justifiably resent a blow by stabbing.    Stabbing may, under .some circumstances, be justified as a measure of prevention, but never as a measure of resentment.    It may be justified when done to prevent ·the infliction of a present impending injury amounting to a felony, but cannot be justified when committed in a spirit of resentment for past injuries.    If done in heat of blood ·upon such provocation as would reduce the grade of his offense to manslaughter in the event death had ensued, it ·might palliate the degree of the stabber's guilt and reduce his offense to a misdemeanor, but he could. not lawfully be justified.    But even if such a thing were legally possible, it would be a question of fact for the jury to say whether or not the accused could, under all the circumstances proved before them, "justifiably resent" the assault described in the request by stabbing his assailant with a knife; and the charge was properly refused, not only because its effect would have been to give to the jury erroneous instructions as to the law, but because it invited an invasion of the province of the jury by the expression of an opinion upon the ·evidence.

2.  We are of the opinion, however, that in view of the ·evidence submitted, the court should have given to the jury instructions embodying at least some reference to the inequality between the relative sizes of the two combatants. The evidence showed that the accused was scarcely half so large a man in physical stature as the person stabbed; that in addition to this, he was weak and feeble of frame and greatly emaciated by disease, while, on the contrary, his assailant was a man of splendid physique and very much his

superior in point of ability to fight. It is not difficult to
imagine how, under such circumstances, the feebler man.
might, in order to protect himself against having the life
crushed out of him by the superior force of his adversary,
justifiably resort to the use of a weapon for his defense, and
this is true even though he might have given the first prov-
ocation. For while the first provocation might be suf-
ficient to excuse a moderate beating, if the battery proved.
extend so far beyond the provocation as either to amount
to a felony or to endanger the life of the person beaten, it
would itself then become unlawful, and the person upon.
whom it was being inflicted might be justified in using even.
a deadly weapon in resistance. This seems to have been
the theory of the defense as it is outlined in the record, and
it is difficult to understand how the court could have pro-
ceeded with its instructions, without referring to the dis-
parity in the sizes of the two men. While the instruc-
tion asked was not technically accurate, and was therefore
properly refused, the defense set up was so involved in the
case made by the evidence as that an omission to charge
upon it was equivalent to not instructing the jury at all upon
one of the leading features of the case. With or without
request, the court should charge the jury upon the general
features of the law which control the substantial issues
made, but if the matter be merely collateral, or more spe-
cific instructions be desired upon a subject covered by the.
general charge, such instructions should be requested. As
was said by Chief Justice Jackson, speaking for the court
in the case of the *Central Railroad v. Harris,* 76 *Ga.* 510:
"The verdict can never be a legal verdict unless instructions
on the law of the case be given by him who presides for that
purpose. The omission to cover the case substantially must
always set it aside." See also, to the same effect, the cases.
there cited.

We have carefully read the general charge of the court.
which comes up in the record, and we find no reference to

the subject indicated; and hence we are of the opinion that the judgment should be reversed and a new trial awarded.

*Judgment reversed.*