## HERRINGTON *v.* THE STATE.

1. The prayer of the deceased, after having been shot and mortally wounded by the accused, that God would forgive the latter "for doing him that way," was, under the circumstances disclosed by the evidence, a part of the res gestæ of the homicide.

2. It is not an expression of opinion upon the evidence for the trial judge to state the answer of a witness to a given question; nor is the fact that he inaccurately states such answer cause for a new trial, when it appears that the inaccuracy in such statement of the answer is wholly immaterial, and not harmful to the party excepting.

3. In the concluding argument for the accused to the jury his counsel, for the first time, urged the theory that the death of the deceased was due to treatment by physicians, and the judge thereupon, in the presence of the jury, propounded to counsel the question, " 'Do you mean . . to take the position that the man did not die as a result of the wound he received—that the doctors killed him?'—the manner of said question being expressive of surprise at said position." *Held,* that

"the manner" of the question, or the degree of surprise indicated thereby, is not so clearly and distinctly presented in the ground of the motion for a new trial, containing the language above quoted, as to enable this court to pass on the question as to whether or not the expression of surprise, as indicated by the inflection of the judge's voice, amounted to an intimation of an opinion upon the evidence.

4. The instruction, that if the jury believed a given state of facts to have existed at the time of the killing, the accused would be guilty of murder, was not erroneous upon the ground that there was nothing in the evidence, or the prisoner's statement, from which the jury could have found such circumstances to have existed, as they might have done so from the statement of the accused; nor did this instruction tend to exclude from the consideration of the jury the defense of justifiable homicide.

5. The evidence and the statement of the accused contained in the record now before us being, in all material respects, substantially the same as upon the former trial, the decision of this court when that trial was under review (Herrington v. State, 125 Ga. 745, 54 S. E. 748) that under no view of the evidence, or the prisoner's statement, was voluntary manslaughter involved in the case, was directly applicable to, and the law of, the case as made by the evidence and the statement of the accused upon the last trial.

6. There was nothing in the evidence or the prisoner's statement to authorize an instruction upon the subject of involuntary manslaughter in the commission of a lawful act.

7. The evidence fully warranted the verdict, and there was no error in refusing a new trial.

Argued October 23, 1907.—Decided March 6, 1908.

Indictment for murder. Before Judge Hammond. Burke superior court. July 8, 1907.

Brinson & Davis and Phil. P. Johnston, for plaintiff in error.

John C. Hart, attorney-general, and J. S. Reynolds, solicitor-general, by John M. Graham, contra.

FISH, C. J. S. R. Herrington was tried under an indictment charging him with murder, and was found guilty of that crime. He made a motion for a new trial, which was overruled, and he excepted. He had been tried at a previous term of the court, under the same indictment, and found guilty of voluntary manslaughter. Being then refused a new trial by the trial court, he brought the case to this court, where the judgment refusing a new trial was reversed, on the ground that the judge below had erred in charging the law of voluntary manslaughter, this court being of opinion that "There was no view of the evidence, or the statement of the accused, under which a verdict for voluntary manslaughter could be

legally rendered, and it was error to give in charge the law relating to this grade of homicide."

1. The original motion for a new trial, in the present case, contained only the usual general grounds. The first ground of the amendment thereto assigned error, "Because the court erred in allowing Mr. Dudley Rogers, a witness for the State, to testify as 'a part of the res gestæ,' over objection of counsel for defendant, that 'He [the deceased] prayed for himself and asked God to forgive Mr. Herrington for doing him that way;' the witness having further testified that this occurred after defendant had shot deceased, and after deceased had walked to the piazza of Graham & Buxton's store and after defendant had gone into the store of W. R. Bargeron, on the opposite side of the street, closed the door, and was out of hearing. The objections which were urged to the admission of this testimony were: that the prayer of the deceased did not appear to be a dying declaration, nor a part of the res gestæ; that "it did not relate to how the act was done nor the motive, nor tend to fix the blame upon the defendant for the shooting," and, "further, that the language, while not illustrating the issue, was calculated to have a sensational effect upon the jury and excite undue prejudice against the defendant." We have carefully examined and considered the testimony of the witness Rogers as contained in the record, and find therefrom that he testified: The shooting of the deceased by the accused occurred in the village of Sardis, in the road between Graham & Buxton's store and Bargeron's store, which were on opposite sides of this road and were, in his opinion, about ninety feet apart. (In the opinion of another witness, they were not more than fifty feet apart.) The deceased, at the time he was shot, "was between eight and fifteen feet from Graham & Buxton's store." Three shots were fired, all by the accused. When the first shot was fired, the parties were not more than two or three feet apart; and when the accused fired the third time, the deceased "walked on towards Graham & Buxton's store," and "walked until he got right between the center post [posts?] on the piazza of Graham & Buxton's store, and sat down on the edge of it [the witness illustrating how the deceased sat down], and fell over. I caught his head and he then prayed for himself and asked God to forgive Mr. Herrington for doing that way." Clearly, from this testimony, the prayer of the deceased was so

close in point of time to the firing of the shots by the accused as to be considered contemporaneous therewith. But, as appears above, the motion for a new trial states that the prayer was not offered until after the accused had gone into Bargeron's store, on the opposite side of the street, and closed the door. This statement is not borne out by the testimony of the witness as it appears in the brief of evidence, but, taking it to be true, it is evident that the accused could have walked to Bargeron's store from the point where he was when he fired the last shot, gone in and closed the door, within a minute or less. It appears, however, from the testimony of the witness, as found in the record, that the accused, when he fired the last shot, turned and ran toward Jim Smith, brother of the deceased, who was near by, and "Jim Smith ran up the big road, and turned toward W. R. Bargeron's house, but turned and went in his [Jim Smith's] store [which was about thirty-five or forty yards from Bargeron's store] and got a gun and came back on the piazza, and Mr. Herrington . . went in the store [Bargeron's] and barred the door." Clearly, even if the prayer of the deceased was not uttered until after all these incidents had occurred, which, from the testimony, apparently rapidly followed the shooting of the deceased, the judge was authorized to hold that it was, so far as the question of time was concerned, a part of the res gestæ of the homicide. In *Thomas v. State,* 27 *Ga.* 287, sayings of the accused, "about a minute or a minute and a half after he shot the deceased," were held admissible as part of the res gestæ. To the same effect is *Mitchum* v. *State,* 11 *Ga.* 615. In *O'Shields* v. *State,* 55 *Ga.* 698 (1), it was held: "Res gestæ embrace sayings of the parties within two to five minutes of the transaction which resulted in the homicide, and before preparation for defense could probably have been in the mind of the party speaking." In *Stevenson* v. *State,* 69 *Ga.* 68, it was held that the statement of the deceased that the defendant had shot her, made about three or five minutes after the shooting, to witnesses who, having heard the report of the gun and her screams some three hundred yards away from them, ran to her assistance, were admissible as part of the res gestæ. It was held in *Mitchell v. State,* 71 *Ga.* 128: "Where a witness reached the scene of a conflict in a very few minutes after the deceased fell, and assisted in bearing him away, and when they had gone about thirty or

forty steps the wounded man asked the witness, 'What did you shoot me for?'—the whole transaction not occupying more than five minutes,—such facts were a part of the res gestæ."

The prayer of the deceased being, so far as the question of the time of its utterance is concerned, a part of the res gestæ of the occurrence to which it related, the next question to be considered is, was his prayer for the forgiveness of his assailant for what he had done to him, in its substance, a part of the res gestæ? It clearly was not the narrative of a past event, but seems to have been the spontaneous and natural expression of the impression made upon the mind of the speaker by the fatal rencounter and the incidents immediately connected therewith. It tended possibly to illustrate the state of his own mind at the time he was shot and immediately prior thereto toward the accused, and the deceased's motives and the character of his acts just before he was shot. In *Goodman* v. *State*, 122 *Ga.* 111 (49 S. E. 922), it was held: "It was not error to admit in evidence as res gestæ the declaration of the deceased, 'Oh, Lord, my poor wife and children!' made as he fell from the fatal wound. Even if of doubtful admissibility, it was properly permitted to go to the jury, in order that they might consider what light, if any, it threw upon the condition of the mind or motives of the deceased at the time he was shot." If the substance of that exclamation, which contained no reference to what occurred at the time of the shooting, was such as to render it admissible as a part of the res gestæ, surely in the present case the prayer of the deceased for the forgiveness of the man who had just shot him, for what he had thus done to him, was admissible as a part of the res gestæ of the main fact under investigation. As we have seen, in *Mitchell's* case, supra, the deceased asked a person who was assisting in bearing him away from the scene of the conflict, where he had received his mortal wound, "What did you shoot me for?" And this question, or remark, of the deceased was held admissible as res gestæ of the shooting. The purport of this question was that the mortally wounded man did not know why he had been shot, that the impression on his mind, at that time, was that he had done nothing to provoke the shooting. In the present case, the purport of the prayer of the deceased for the man who had shot him was that he, the deceased, had done nothing which justified Herrington in shooting him. In *Monday* v. *State*,

*32 Ga.* 672 (79 Am. D. 314), a declaration by a person imme-
iately after being assaulted, showing the impression made upon
his mind as to the nature of the attack and the intention of his
assailant, was held admissible as part of the res gestæ. In that
case the testimony showed that the prosecutor had been choked ·
severely, so much so that he could scarcely get up from the ground,
·his throat being skinned on both sides of his neck, and he being
otherwise badly hurt and much exhausted. A witness who, upon
hearing his cries, came to where he was and, as he did so, saw
some one running off, was permitted to testify that he asked the
prosecutor what was the matter, and he replied that defendant was
trying to choke him to death. In the light of these decisions, the
court below did not err, in the case now under consideration, in
admitting the testimony in question.

2. Error was assigned in the motion, because, when defendant's
counsel in cross-examining Dr. Buxton, a witness for the State,
asked him, "Did you do anything to the wounds at all before Dr.
Chandler got there?" the court, interrupting counsel, said, in the
·presence of the jury: "That question has been asked by counsel
already. He said he put iodoform gauze on the wound before Dr.
Chandler got there, and that was the only treatment he gave him."
The specific assignments of error were: "That this was a direct
expression on the part of the court as to what facts the witness
had and had not testified to." That "the statement of the court
was particularly harmful in view of the fact that the witness had
previously testified, both on the direct and on the cross, 'I did
not wait until Dr. Chandler came. I punctured him with mor-
phine, I gave him a puncture of stimulants also—heart stimu-
lants, strychnine, one sixtieth of a grain I believe, did not give
him over one thirtieth I know, might have given him two doses of
one thirtieth each;' and in view of the further fact that said wit-
ness testified that he 'attended him from about eight o'clock that
morning until he died the next morning about three o'clock'—
there being no positive or direct proof that either wound inflicted
by defendant was mortal." It is evident that the judge was
merely stating the answer of the witness, as he remembered it, to
this same question when counsel had previously propounded it. Ac-
cording to the statement of the judge, the witness, when then·
asked what he did to the wounds before the arrival of Dr. Chand-

ler, had answered that he put iodoform gauze on the wound before Dr. Chandler got there, and that was the only treatment he gave him.    Apparently this answer, as repeated in the language of the judge, when construed in the light of the question to which it was responsive, meant that all the treatment which the witness gave the wounds before the arrival of Dr. Chandler was to put iodoform gauze on them.    At any rate, it could mean no more than that all the treatment which the witness gave the wounded man before Dr. Chandler got there was to put iodoform gauze on the wounds. It is true that the witness did testify that he punctured the patient with morphine and gave him one sixtieth—possibly one thirtieth—of a grain of strychnine before Dr. Chandler came; but, relatively to the contention that the wounded man was killed by the doctor and not by the accused, it is evident that it mattered not whether the morphine and strychnine were administered before or after the arrival of Dr. Chandler.    The jury had just heard the witness testify on cross-examination, and, as appears from the brief of evidence, immediately before this statement of the judge was made, that he had administered morphine and strychnine to the patient before Dr. Chandler got there, and we do not see how they could possibly have been misled by the statement of the judge into believing that the witness had testified that all the treatment which he, at any time, gave the wounded man was to put iodoform gauze on the wounds.    With the testimony of the witness so fresh in their minds, nothing having intervened to divert their attention therefrom, it does not seem possible that they could have even believed that the judge, in whose presence and hearing this testimony had just fallen from the lips of the witness, meant to say that the witness had testified that all the treatment which he gave the wounded man, before or after the arrival of Dr. Chandler, was to put iodoform gauze on the wounds.    It is even hard to believe that they could have understood the judge to mean that the witness had testified that this was all the treatment which he gave the wounded man before Dr. Chandler arrived; but if they did believe this, and even if they, under the circumstances, could have accepted it as a correct statement of the testimony of the witness, the contention that the deceased was killed by the doctor, and not by the accused, would not have been affected in the slightest degree; for as to this contention it was im-

material, as we have said, whether the morphine and strychnine were administered before or after Dr. Chandler got to the patient. This ground of the motion afforded no cause for the grant of a new trial.

3. In another ground error was assigned, because "while P. P. Johnston, one of the counsel for defendant, was addressing the jury and taking the position before them that the evidence had not shown, beyond a reasonable doubt, that the death of the deceased . . had been caused by 'the shot fired by the defendant, the court interrupted and asked counsel, in the presence of the jury, 'Do you mean, Mr. Johnston, to take the position that this man did not die as a result of the wound he received—that the doctors killed him?' the manner of said question being expressive of surprise at said position. This point had not been referred to in any of the preceding arguments, and this [was] the concluding argument in the case." The specific assignment of error was that this "was an expression of opinion on the part of the court, on the evidence, on a contested issue in the case; . . that, whether so intended or not, the natural construction to be placed by the jury on the asking of such question by the court, would be that the court was expressing an opinion upon the evidence in the case, and that the contention of counsel was without merit." The accused had introduced no evidence, and so his counsel had both the opening and the conclusion of the argument before the jury, and one of such counsel, in making the concluding argument, was apparently presenting an entirely new contention and theory of the case, one which had not been referred to, either in the opening argument for the accused or in the arguments of counsel for the State. It was therefore perfectly natural that the judge should have been somewhat surprised that this position should be apparently taken by counsel for the defense in the concluding argument to the jury. It would seem, therefore, that counsel for the defendant were themselves, in a great measure at least, responsible for whatever indication of surprise there may have been in the tone or inflection of the voice of the judge as he propounded the question. They may be said to have sprung a surprise both on the counsel for the State and the trial judge, by reserving this material contention until the last argument in the case was being made. It is perfectly clear that the judge could properly ask such a ques-

tion, in order that there might be no uncertainty whatever as to the contentions of counsel for the accused. So the question itself was eminently proper. "The manner" in which it was asked is a matter which, in the very nature of things, can not be clearly and distinctly presented to a reviewing court. Tones and inflections of the human voice can not be reproduced in a motion for a new trial, a bill of exceptions, or a judicial record. Whether "the manner" of propounding the question was expressive of much or little surprise it is impossible to tell, as all the information which the motion affords is that the manner of asking the question was "expressive of surprise." It was held in *Rountree* v. *Gurr*, 68 *Ga.* 292, that "An exception to the manner or tone of voice of the court in delivering his charge is not reviewable by this court, there being no way by which it can be reflected here or its influence estimated." In *Anderson* v. *Tribble*, 66 *Ga.* 584, 588 (2), the court, referring to a ground of the motion for a new trial assigning error upon a part of the charge of the trial judge, said: "The objection to this part of the charge is, that the judge failed to present the case of the plaintiff in error as made by the pleadings and proof, except in generalities, which was unfair, considering the minute manner in which he had presented the case for the defendant in error. The emphasis was also lacking in the presentation of the case for the plaintiff in error. We fail to see any want of fairness in the manner of presenting the case in this ground of exception. And as to the *emphasis* of the judge in his charge, we are utterly unable to pass upon that, as there are no means yet provided for conveying to this court the cadences of the judge when he instructs the jury for one side, and again its emphatic swell when he is instructing for the other." It is said, in the brief of counsel for plaintiff in error, that the judge certifies "that his manner of asking the question was that of surprise." The only way in which he certified it was by approving the grounds of the motion for a new trial and certifying that the recitals of fact contained there are true. This, we apprehend, is no more than was done by the trial judge in each of the above-cited cases; for if the ground of the motion in *Rountree* v. *Gurr,* in reference to the manner or tone of voice of the judge in delivering his charge, had not been certified by the trial judge, it would not have been considered by the reviewing court; and the same may be said in

reference to the ground of the motion for a new trial in *Anderson
v. Tribble,* which was dealt with by this court as indicated
above. Counsel for plaintiff in error cite *Sharpton* v. *State,* 1
*Ga. App.* 548 (57 S. E. 929) ; but in that case the reviewing court
dealt with the language used by the trial judge, as reproduced in
the record, and not with the tones or inflections of his voice. We
can not say that the expression of surprise as indicated by the in-
flection of the judge's voice amounted to an intimation of an opin-
ion upon the evidence in the case.

4. In one ground error was assigned because the court instructed
the jury that under given circumstances the accused would be
guilty of murder. The special assignments of error upon the in-
struction, which are referred to in the brief of counsel for plain-
tiff in error, are: that there was nothing in the evidence or the
prisoner's statement to support the charge; that, "even under the
assumed statement of facts," the charge did not correctly set
forth the law applicable thereto, as these facts "might justify a
verdict of manslaughter;" that the charge was unfair to the de-
fendant, as not being authorized by his statement; that it "was
misleading and confusing and tended to exclude from the consid-
eration of the jury the law of manslaughter," and to exclude from
their consideration the defense of justifiable homicide. The con-
tention that there was nothing in the evidence or the prisoner's
statement upon which the charge could have been based was not
well taken; as the jury might have found, from a portion of the
statement of the accused, if they accepted it as true, that what
the exception terms "the assumed statement of facts" really ex-
isted at the time of the killing. The instruction did not tend to
exclude from the consideration of the jury the defense of justi-
fiable homicide. The court had just instructed the jury that "If
Smith, at the time of the killing, manifestly intended or en-
deavored, by violence or surprise, to commit a felony on Herring-
ton, and Herrington killed him, the killing would be justifiable;"
that if "Herrington had well-founded reasons to believe himself
in imminent peril, without having by his own fault produced the
emergency, the killing would not be murder;" that if they had "a
reasonable doubt . . as to whether or not Herrington, at the
time of the shooting, believed himself in imminent peril, and shot
under the influence of such fears in self-defense, and not in a

spirit of revenge, it would be [their] duty to give him the benefit of such doubt and acquit him, [that] this is the law, whether the peril was real or only apparent to him." How a charge, given in immediate connection with these instructions as to self-defense, that, under a different state of circumstances, which under no view thereof involved the law of justifiable homicide, the accused would be guilty of murder, tended to exclude from the minds of the jury what the court had just charged them upon the subject of self-defense we are unable to see. The exception to which we have given the most consideration is the one in reference to the tendency of the instruction complained of to exclude from the consideration of the jury the law of manslaughter; and this we dispose of below, together with other grounds of the motion for a new trial, involving the applicability of the law as to manslaughter to the facts of the case.

5. The court gave in charge to the jury the law upon the subject of voluntary manslaughter, and error is assigned in one ground of the motion, because the court said to the jury. "If this is a case of manslaughter, it is a case of voluntary manslaughter," the assignments of error being, that this language expressed doubt as to whether the law of manslaughter should be considered by the jury at all, and, further, that the law as to involuntary manslaughter was involved in the case. Another ground complains because the court failed to give in charge the law of involuntary manslaughter in the commission of a lawful act. When this same case was formerly before this court (125 *Ga.* 745 (54 S. E. 748)), it was held: "The evidence for the State demanded a verdict for murder. The accused introduced no evidence, but his statement, if credible, authorized an acquittal. There was no view of the evidence, or the statement of the accused, under which a verdict for voluntary manslaughter could be legally rendered, and it was error to give in charge the law relating to this grade of homicide. The accused having been convicted of voluntary manslaughter, a new trial must be granted." It is obvious that the decision then rendered is now the law of this case, unless the case upon the last trial, as made by the evidence, or by the statement of the accused, was, in some respect, materially different from the case as made by the record with which the court was then dealing. We have made a careful and minute comparison of the evidence then

before this court with the evidence now before the court; we have, in like manner, compared the prisoner's statement on the former trial with the statement which he made in the trial now under review, and, in our opinion, the case, as made by the evidence, or as made by the statement of the accused, is now, in every material respect, substantially the same as it was when the above-quoted decision was rendered. Upon the first trial the accused introduced no evidence, and the evidence for the State, taken to be true, demanded a verdict of murder. Upon the last trial he again introduced no evidence, and again the evidence for the State demanded such a verdict. And as the statement which he made when last tried was, in all material respects, the same as the one which he made upon the former trial, it must be held that while, if believed, it would have authorized a verdict of not guilty, it contained nothing upon which to legally base a verdict of voluntary manslaughter. Hence the decision of this court when the case was here before was the law of this case upon the last trial, under the evidence then submitted and the statement of the accused then made. Whatever may be the force of that decision in any future case involving substantially similar facts, there is no escape from the conclusion that it settled the law to be applied to the facts of this case as disclosed by the record before us. Therefore the accused had no right to have the law upon the subject of voluntary manslaughter submitted to the jury; and hence he can not complain of one portion of the charge as tending to exclude such subject from the consideration of the jury, nor of another portion thereof as incorrectly stating the law in reference thereto. See, in this connection, what is said at the close of the opinion in *Wheeler* v. *State,* 112 *Ga.* 43, 47 (37 S. E. 126). If, as his exceptions seem to indicate, he desired the law in reference to voluntary manslaughter to be submitted to the jury, he got more than he was entitled to when the judge charged upon this subject. Even if he had, in the motion for a new trial now under consideration, complained, as he did before, because the court charged upon the subject of voluntary manslaughter, he would not, for this reason, have been entitled to another trial, as the jury convicted him of murder, and not of voluntary manslaughter. *Joiner* v. *State,* 105 *Ga.* 646 (31 S. E. 556).

6. There was nothing in the evidence, or the prisoner's state-

ment, to authorize an instruction upon the subject of involuntary manslaughter in the commission of a lawful act. This is clear from the record before us, and it is indicated by the previous decision in the case, upon substantially the same facts.

7. The evidence fully warranted the verdict, and there was no error in refusing a new trial.

*Judgment affirmed. All the Justices concur, except Atkinson, J., dissenting, and Holden, J., not presiding.*

ATKINSON, J., dissenting. 1. I do not concur in the ruling announced by the majority in the first division of the opinion. A witness was permitted to testify, over objection of counsel for the defendant, that "He [the deceased] prayed for himself, and asked God to forgive Mr. Herrington for doing him that way." This testimony was admitted as a "part of the res gestæ." When it was offered, counsel for the defendant objected to its admission, among others, upon the ground that it was not a part of the res gestæ, and "that it did not relate to how the act was done, nor the motive, nor tend to fix blame upon the defendant for the shooting;" and further, "that the language, while not illustrating the issue, was calculated to have a sensational effect upon the jury, and excite undue prejudice against the defendant." The objections raised to this testimony were well founded. The evidence was of such character as tended to accomplish substantial injury to the cause of the accused, by generating prejudice against him in the minds of the jurors. It was irrelevant, and had no bearing upon the law of the case. No principal fact was in issue which the declaration tended to illustrate. With respect to the admission of declarations as res gestæ, it is said in 1 Gr. Ev. (15th ed.) §108: "There are other declarations which are admitted as original evidence, being distinguished from hearsay by their connection with the principal fact under investigation. The affairs of men consist of a complication of circumstances so intimately interwoven as to be hardly separable from each other. Each owes its birth to some preceding circumstance, and, in turn, becomes the prolific parent of others; and each, during its existence, has its inseparable attributes, and its kindred facts, materially affecting its character, and essential to be known in order to a right understanding of its nature. These surrounding circumstances, constituting parts of the res gestæ, may always be shown to the jury,

along with the principal fact; and their admissibility is determined by the judge, according to the degree of their relation to that fact, and in the exercise of his sound discretion." Under this rule the declarations are admissible only in connection with some principal fact material to the case, for the purpose of explaining the fact. Where there is no principal fact to be illustrated, the declaration will have no legal office to perform, and, if liable to have an improper influence upon the jury, it should be excluded. Upon the point that the declarations must be relevant to the issue on trial, before they would be admissible as res gestæ, see the cases of *Monroe* v. *State*, 5 *Ga.* 85, 134; *Armistead* v. *State*, 18 *Ga.* 704 (2) ; *Brown* v. *State*, 28 *Ga.* 199 (3).

2. Nor do I concur in the conclusion announced in the fourth division of the opinion. The charge excepted to was as follows: "If Herrington, at the time he shot Smith, had reason to believe and did believe that Smith was merely going to run into him and strike him with his hand, and do nothing to him worse than that, that would be a battery, and Herrington had no right to take Smith's life; and if he did so under these circumstances, he would be guilty of murder." One of the grounds upon which this charge was assigned as error was that it tended to exclude from the consideration of the jury the defense of justifiable homicide. The court had previously instructed the jury upon the law of justifiable homicide. There was nothing stated by the judge suggesting a qualification of that part of the charge set out in the foregoing excerpt. Indeed, the language of the excerpt purports to apply the law to the particular case, and in positive terms instructs the jury that, under conditions such as are therein enumerated, the defendant would not have been justified in taking the life of the deceased. If the court was in error in giving this instruction, it was harmful error and sufficient cause for the grant of a new trial. Under the Penal Code, §70, a person may take the life of another when done in defense of his person, as against one who manifestly intends and endeavors, by violence or surprise, to commit a felony upon him. In this case, if the accused shot the deceased in order to save his own life or in order to prevent the deceased from committing a felonious assault upon him, he would have been justified under the provisions of the code to which allusion has just been made. The charge of the court amounted to an instruction, as a matter of

law, that a stroke from the bare hand of. the deceased could not have amounted to a felony. This position is not tenable. Conditions are numerous where one person may by a stroke of the hand take the life of another; as, for example, where the assailant has great physical power and the person assailed is of feeble vitality, either from the infirmities of old age or from waste by disease or from extreme youth. In such cases it is obvious that death may result from a blow from the hand administered by such an assailant. These may be said to be extreme cases, but there are others where the disparity is not so marked. The same element of fact is common to all. In the case at bar there was great physical inequality between the parties. The deceased was a young man, about 23 years of age, vigorous and strong, and the accused was an old man, with no right arm and his left hand "crippled." He did not have the means of warding off a blow, and the court as a matter of law could not say that a blow from the hand of the deceased delivered upon the person of the accused would or would not have produced fatal results. That question should have been left to the jury, and, as in any other case where there is evidence tending to show that the accused took the life of the deceased in order to defend his own life, or to prevent a felony from being committed upon him, the jury should have been allowed to determine whether, under all the circumstances, the defendant was justified. This position is in harmony with the reasoning in *Baldwin* v. *State,* 75 *Ga.* 482, *Strickland* v. *State,* 98 *Ga.* 84 (25 S. E. 908), and *Alexander* v. *State,* 118 *Ga.* 26 (44 S. E. 851). The last two of these cases relate to the refusal of certain requests to charge; but in each instance the ruling clearly recognizes that it is for the jury to say whether, under circumstances of physical inequality, the weaker may defend as against a blow from the hand of the stronger by using a deadly weapon. In *Alexander's* case, Mr. Justice Lamar, speaking for the court, said: "Under the limitations placed by Civil Code, §4334, on the powers of a judge, it is generally of doubtful propriety for him to enumerate a given state of facts and tell the jury what the effect thereof is, or what use they must make of the facts. But it is forbidden for the judge to enumerate a state of facts, and then tell the jury what use they must make of them." That is in effect what the court did in the case now under consideration. The charge of the court was open

to the criticism made upon it, and the error was of such character as to require the grant of a new trial.