## WALKER *v.* THE STATE.

1. Where, on the trial of one accused of the murder of his wife, the defendant offered in evidence three letters purporting to have been written by his wife several months before her death and left with him, not to be opened until after her death, two of which were addressed to the sister of the wife and one to a young lady of the neighborhood, referring in affectionate terms to the defendant, and these letters were received in evidence in rebuttal of the proof submitted by the State tending to show that the defendant was cruel to his wife, though the court should not have restricted a consideration of them to this purpose, yet in view of the evidence such an instruction is not cause for a new trial.

2. The State submitted evidence tending to show that the letters were written by the defendant, and in formulating the State's contention in this regard the court inadvertently used the word "conspiracy," in the sense of a premeditated plan, but the context, as well as the language complained of is such that the jury were not likely to understand that the word "conspiracy" was used in its technical sense.

3. Where the accused is on trial for the murder of his wife by setting fire to her person and clothing, and it appears that immediately after the clothing of the decedent was ignited the defendant ran to a neighbor's house about 175 yards distant, and also called to a person, who lived about 75 or 100 yards further on, that his wife was on fire and to run quickly, and that person ran to the house closely behind the defendant, the testimony of such person that upon entering the house and seeing the decedent lying on the floor, moaning and screaming, and the defendant pouring water upon her smoking body, the witness exclaimed, "My God, how did it happen?" and the decedent's reply was, "He did it; he stuck fire to me and did it; he did it on purpose," and, upon the defendant's saying to the witness, "I don't know no more about it than you do," the decedent called the wit-

ness to come nearer and said, "He [the accused] is afraid the court will handle him, and he did it on purpose," is admissible as part of the res gestæ.

4. It is not error to instruct the jury that "A witness is successfully impeached whenever the minds of the jury become satisfied from the testimony that that witness is unworthy of belief."

5. Where there is no attempt to impeach any witness by proof of general bad character, but there is evidence tending to impeach a witness by proof of previous contradictory statements, and there is a conflict in the testimony of some witnesses, a charge on the subject of the impeachment of witnesses by proof of contradictory statements is not erroneous because the court does not in terms instruct the jury that one mode of impeachment of a witness is by disproving the facts testified by the witness, where the court properly instructs the jury upon the rules respecting the weight and credit to be given a witness in the event of conflicts in the testimony.

6. Where there exists a difference between opposing counsel as to whether there is a discrepancy between the testimony of a witness and a previous statement alleged to be contradictory of the testimony, it is not error for the court to allude to the particular witness in stating the contentions of counsel in this respect, and instructing the jury that they must decide the controversy between counsel from the evidence in the case.

7. The defendant, his wife, and his mother concurrently took out policies of insurance on their respective lives; the policies on the lives of the defendant's wife and his mother were payable to him, and that on his own life was payable to his wife. On the trial of the defendant for the murder of his wife the State introduced the policy on his wife's life, as tending to show motive, and the defendant in rebuttal offered the policies on the life of himself and of his mother; the former was received and the latter repelled as irrelevant. This was not error.

8. Where an indictment for murder contains two counts, the first charging that the defendant threw gasoline and other inflammable liquids on the person and clothing of the decedent and then set fire to the decedent's person and the second charging that he set fire to the person and the clothing of the decedent, a statement of a contention of the prosecution that the defendant set fire to the person of the decedent is not erroneous because of the failure of the court to separately direct the attention of the jury to the formal charge in each count.

9. It is not erroneous to decline to instruct the jury that " on the trial of a person charged with crime, the manner of proof ought to be more clear in proportion as the crime is more detestable."

10. The alleged newly discovered evidence is cumulative, and not of such character as would probably produce a different result; the grounds of the motion are without substantial merit, and the evidence is sufficient to uphold the verdict.

DECEMBER 12, 1911. REHEARING DENIED JANUARY 12, 1912.

Indictment for murder. Before Judge Felton. Bibb superior court. June 2, 1911.

*John P. Ross,* for plaintiff in error.  *T. S. Felder, attorney-general,* and *W. J. Grace, solicitor-general,* contra.

Evans, P. J.  The defendant was indicted for the murder of his wife, Alma Walker.  He was convicted, and sentenced to be hanged.  The indictment contained two counts; the first charged that the defendant, after having thrown gasoline and other inflammable liquids upon her person and clothing, did set fire to her person; and the second count charged that he set fire to her clothing and person.  The evidence was entirely circumstantial, and we think sufficient to authorize the verdict.  It would be unprofitable to reproduce the essential features of the case as embodied in the voluminous record, and for that reason we will not attempt it.

1.  The State offered evidence tending to show that the defendant had cruelly treated his wife.  The defendant introduced certain letters purporting to have been written by his wife several months prior to her death and left with him not to be opened until after her death.  Two of these letters were addressed to an unmarried sister of the decedent, and one to a young lady of the neighborhood; they referred most affectionately to the defendant, and each contained a request for the addressee to marry the defendant in the event of her death.  The State submitted evidence tending to show that the letters were written by the defendant, and the defendant introduced evidence tending to prove that they were written by his wife.  With reference to these letters the court charged that the defendant had offered them for the purpose of showing that no ill feeling existed between him and his wife, and that his treatment of her was kind and proper.  The defendant complains that this instruction unduly limited the effect of the evidence, because the letters also tended to show a morbid disposition or unbalanced mind of the reputed writer, so as to raise an inference of self-destruction, or accidental death by careless act.  While the court's charge may have been somewhat restricted, yet, in view of the evidence in the record, we do not think the charge sufficient ground for a new trial.

2.  In stating the State's contention with reference to the authenticity of the letters, the court said that the State contended that the letters were written by the defendant, "and contends that there was a purpose in writing those letters,—that it fixes the

crime as a conspiracy arising under this bill of indictment charging the defendant with the death of Alma Walker." The quoted language is objected to on the ground that no conspiracy was charged and none proved. It is clear from the context that the court did not use the word "conspiracy" in its technical sense, and it is equally clear that the jury could not have so understood. The trend of the charge, and the very next sentence, show that the court meant that it was the State's contention that the letters were fabricated in pursuance of a plan of the defendant which indicated preparation and premeditation.

3. A witness, Classie Lightfoot, was permitted to testify to declarations of the decedent, made while she was lying on the floor and her husband was pouring water on her smoking body, and within a few minutes after her clothing had become ignited, to the effect that the defendant had intentionally set her on fire. It is insisted that the declarations were not spontaneous with the act and indicated deliberation on the part of the declarant, and were inadmissible as part of the res gestæ.

It is impossible to frame a definition of the term res gestæ which will adequately cover all the various and different uses to which it is put. As was said by Bleckley, J., in *Cox* v. *State,* 64 *Ga.* 410 (37 Am. R. 76) : "The difficulty of formulating a description of the res gestæ which will serve for all cases seems insurmountable. To make the attempt is something like trying to execute a portrait which shall enable the possessor to recognize every member of a very numerous family." Our code defines it as declarations accompanying an act or so nearly connected therewith in time as to be free from all suspicion of device or afterthought. Civil Code (1910), § 5766. "The res gestæ of a transaction is what is done during the progress of it, or so nearly upon the actual occurrence as fairly to be treated as contemporaneous with it. No precise point of time can be fixed a priori where the res gestæ ends. Each case turns on its own circumstances." *Hall* v. *State,* 48 *Ga.* 608. The best guide to keep within the rule is furnished by the decided cases which serve as illustrations of its application. In *Munday* v. *State,* 32 *Ga.* 676 (79 Am. D. 314), a witness was attracted by the cries of the person assaulted. He went to where he was, and some one ran off. He asked the person assaulted what was the matter, to which

26

he replied that the defendant was trying to choke him to death; and this conversation was allowed in evidence as res gestæ. In *Burns* v. *State,* 61 *Ga.* 192, testimony of a witness who lived about six hundred yards from the place of the assault, that the deceased came to his home about an hour before day, Sunday morning, bloody, and, when asked what was the matter with him, said, "You know I went to sleep on the chair and fell out on a piece of wood," was held to be a part of the transaction and so nearly connected with it as to constitute a part of the res gestæ. In *Stevenson* v. *State,* 69 *Ga.* 68, the witness's testimony was that he heard the report of a gun and the scream of a woman about three hundred yards away; he ran immediately to her assistance, and when in speaking distance she cried out for help. He saw that she had been shot, was bleeding freely, could move nothing but her hands, and, whilst begging that something be done for her, she said that defendant had shot her. This occurred from three to five minutes after the shooting. It was held to be admissible as a part of the res gestæ. Where a wounded man, within five minutes from the time he was shot, asked one of the persons who was assisting him what he shot him for, this question was held to be a part of the res gestæ. *Mitchell* v. *State,* 71 *Ga.* 128. In *Kirk* v. *State,* 63 *Ga.* 621, evidence that immediately after the deceased was shot a person near by halloed and asked them what was the matter and who had shot him, to which he replied that the defendant had shot him, was admitted as a part of the res gestæ. Illustrations may be multiplied to show that declarations to be a part of the res gestæ need not be precisely concurrent in point of time, if they spring out of the transaction and are made so near to it as to preclude reasonably the idea of deliberation. *Mitchum* v. *State,* 11 *Ga.* 615; *Herrington* v. *State,* 130 *Ga.* 307 (60 S. E. 572).

When the testimony in question was offered, evidence had been submitted tending to show that immediately after the clothes of the decedent became ignited the accused ran to a neighbor's house about 175 yards distant and told the young daughter of the neighbor that his wife was on fire; that about the same time the accused called a negro by the name of Frank Lightfoot, who lived about 75 or 100 yards from the neighbor's, and exclaimed, "Alma [the wife of the defendant] is on fire; run quick." The

accused returned to his home, closely followed by Frank and his wife. When Frank entered the house he saw the decedent upon the floor, "screaming and halloeing;" her body · was smoking, and the accused was pouring water upon her. Frank left at once for a neighbor, at the request of the accused. His wife, Classie, then came into the room. She testified that she found the decedent lying on the floor, moaning and screaming, and that the accused was pouring water upon her smoking body. Upon entering the room the witness exclaimed, "My God, how did it happen?" The accused attempted to say something, but his wife "headed him off" and said, "He did it; he stuck fire to me; he did it; he did it on purpose." Upon the decedent's reiteration of the statement the accused touched the witness and said, " Classie, I don't know no more about it than you do." Then the decedent called the witness to come nearer and said: "He [the accused] is afraid the court will handle him, and he did it on purpose." The decedent made no further statement, and died within an hour after the conversation with the witness. The transaction inquired about was the homicide of the decedent accomplished by burning. The conversation occurred within a very few minutes, possibly from five to seven minutes, after the clothing of the deceased was ignited. Although the flame had been extinguished, the body was ·still smoking, and the defendant was pouring water upon the prostrate form of his wife at the time of the conversation. The declaration of his wife under such circumstances was clearly a part of the res gestæ, and the instruction relative thereto is not subject to the criticism made upon it.

4, 5, 6. The court instructed the jury on the law of impeachment of witnesses by contradictory statements and the effect of a successful impeachment. He also called· their attention to the defendant's contention that the State's witness, Classie Lightfoot, had sworn differently on the commitment trial, and the solicitor-general's contention that the witness repeated the same testimony which she delivered in the committing trial; instructing them that there was an issue between counsel as to whether or not the witness delivered the same testimony on this trial as she did before the committing court, and that the jury must determine that issue from the evidence. Many exceptions are taken to this charge. One relates to that part of the charge which

instructed the jury that " a witness sought to be impeached by showing that the witness has made contradictory statements may be sustained by proof of general good character of that witness. You will see, therefore, whether or not as a question of fact a witness has been successfully impeached is a matter for determination of the jury. A witness is successfully impeached whenever the minds of the jury become satisfied from the testimony in the case that that witness is unworthy of belief." This instruction was not erroneous. *Powell* v. *State,* 101 *Ga.* 11 (29 S. E. 317, 65 Am. St. R. 277). Another objection is that the court having undertaken to charge on the subject of impeachment of witnesses by contradictory statements, it was incumbent upon it to charge concerning other modes of impeachment of witnesses provided by law. Our code declares that a witness may be impeached, (1) by disproving the facts testified to by him, (2) by proof of previous contradictory statements, and (3) by proof of the general bad character of the witness. Civil Code (1910), §§ 5880, 5881, 5882. If no testimony as to the general bad character of a witness has been offered, it would be error to instruct the jury that a witness may be impeached by this mode. *City Bank of Macon* v. *Kent,* 57 *Ga.* 284 (9). There was no attempt to impeach any witness by proof of general bad character. It is urged that there was conflicting testimony, and that the court should have charged in terms that a witness may be impeached by disproving the facts testified to by the witness. In a certain sense testimony to disprove a statement of a witness is impeaching in its nature. A charge upon the weight and credit to be given a witness's testimony, and the rule as to conflicting testimony, is in effect and substance a charge relating to this mode of impeachment. The jury were elaborately and properly instructed in this respect, and the court's instruction was not open to this objection. It was also alleged that the charge was confusing and misleading, and should have been more elaborate. We do not think the charge was either confusing or misleading. The subject of impeachment of witnesses is not one of the main questions in a case, but is of an incidental or collateral nature; and where the court instructs the jury on the mode and effect of impeachment, the instruction is not so defective as to require a new trial because the court might have elaborated his instruction so as to cover minor corollaries which

may be involved in the main proposition. Nor was the instruction erroneous because the court alluded to a particular witness in stating the deductions which counsel for the State and the accused drew as to any discrepancy between her testimony in the two trials. Counsel for the State contended there was none, and counsel for the accused contended otherwise. In justice to the witness we do not think there was any substantial conflict, but certainly nothing was contained in the court's instruction, that the jury should decide this controversy between opposing counsel by a reference to the evidence in the case, which was calculated to harm the defendant. Besides, this witness was the only one sought to be impeached by proof of contradictory statements, and in such a case it is not error for the court, in instructing the jury on the subject of impeachment by contradictory statements, to refer to the witness by name. *Shaw* v. *State,* 102 *Ga.* 660 (29 S. E. 477).

7. The defendant offered three certificates issued by a burial association in December, 1908, respectively to himself, his wife, and his mother, entitling each to a burial and funeral benefit of a stated amount according to the by-laws of the association; also a policy of insurance for $150 on the life of his mother, in which he was the beneficiary, and the premium receipt book of the company. This testimony was rejected. The defendant contends, that in view of the fact that the State had introduced in evidence a policy of insurance on the life of the decedent, of the same date and for the same amount, payable to him in the event of death, and that he had introduced in evidence a policy on his own life, payable to his wife in the event of death, issued by the same company, for the same amount and on the same date, it was relevant to show that the insurance policies and burial certificates were all issued in pursuance of a plan of family protection, and to rebut any inference that he killed his wife to get the insurance on her life. The policy of insurance on his mother's life could not possibly illustrate any issue in the case. The burial certificates were likewise irrelevant; but even if they tended to elucidate any issue in the case, their rejection was harmless, as an officer of the association was permitted to testify that the accused, his wife, and mother were insured in the association, and that the association buried the deceased on account of her certificate.

8. In stating the contentions of the State the court said: "Now the State claims in this case that Alma Walker died on the 21st of August of last year; and the State claims that her death was the result of a felonious act, an unlawful act of the defendant in bringing about her death, by setting fire to her and burning her up, in such a way as to bring about that death; and the State charges that the defendant in doing so is guilty of murder." This charge is alleged to be error, because the court failed to, invite the jury's attention specially to the two counts in the indictment, one of which charged the defendant with setting fire to the decedent after having thrown upon her person and clothing gasoline and other inflammable liquids, and the other charged him with killing the decedent by setting fire to her person. The defendant was charged with having committed murder by setting fire to the decedent, and the indictment was framed to meet possible phases of evidence as to the manner in which life was taken; and the court's summary of the State's contention in this respect was fair to the accused, and not open to the criticism made upon it.

9. The court declined to charge, on request, that "on the trial of a person charged with crime, the manner of proof ought to be more clear in proportion as the crime is more detestable." The same degree of proof is required in all criminal trials, viz.: that the evidence be sufficient to establish the defendant's guilt beyond a reasonable doubt. This request was properly declined.

10. The motion for new trial includes numerous grounds, but after a careful consideration, we do not find anything contained in them which requires a new trial. The newly discovered evidence was cumulative, and not calculated to produce a different result should another trial be had. The evidence is sufficient to uphold the verdict.

*Judgment affirmed. All the Justices concur.*