## GOODMAN v. THE STATE.

1. The evidence authorized a charge on the law of voluntary manslaughter, and the exception taken to the instruction given in reference to that offense was not meritorious.
2. It was not error to admit in evidence as res gestæ the declaration of the deceased, " O, Lord, my poor wife and children!" made as he fell from the fatal wound. Even if of doubtful admissibility, it was properly permitted to go to the jury, in order that they might consider what light, if any, it threw upon the condition of the mind or motives of the deceased at the time he was shot. (SIMMONS, C. J., dissenting.)
3. Nor was it error to refuse to grant a mistrial on account of the improper remark of the solicitor-general in his argument to the jury, he having expressly withdrawn it and the court having instructed the jury not to consider it.
4. The charge, that if the accused was the aggressor and the deceased drew his club only for the purpose of resisting further aggressions, this would not be sufficient provocation for the homicide, was pertinent. Furthermore, such charge was given while the court was instructing the jury as to the law of murder. The verdict being for voluntary manslaughter, the charge was not harmful to the accused, even if not authorized by the evidence or his statement.
5. If a party have knowledge of a fact and the same can be proved at the trial by evidence, a new trial will not be granted on the ground that other evidence of the fact, claimed to be newly discovered, has been found since the trial, unless the movant satisfactorily explains why he did not use the evidence in his control at the time of the trial.
6. The evidence authorized the verdict, and the court did not abuse its discretion in refusing a new trial.

Argued January 16,— Decided January 27, 1905. Rehearing denied March 2, 1905.

Conviction of manslaughter. Before Judge Cann. Chatham superior court. November 12, 1904.

W. C. Goodman was indicted, at the October term, 1904, of Chatham superior court, for the murder of E. O. Zipperer. On the trial the State introduced only one witness, C. M. Malphus, whose testimony was, in brief, as follows: On September 29, 1904, Goodman, Zipperer, and witness were all policemen in the city of Savannah and were all on duty and in uniform on that day. Goodman and Zipperer, while standing at the doorway of the union depot in Savannah on that day, engaged in a conversation about two negroes, one a boarding-house keeper and the other a drummer for a saloon, who met trains at the station. The conversation at first was apparently friendly, Zipperer asserting that the negroes were causing considerable trouble to the public and also to the policemen on duty at the station, while Goodman expressed the opinion that they were doing no harm. "Zipperer said he would run them in or drive them away whenever they came there when he was on duty; Goodman said that he would not, unless they were obstructing the sidewalk—if they blocked that walk he would run them off; and in the course of the conversation, Goodman said to Zipperer, 'You got no sense; if you had sense you would not act that way.' Zipperer said, 'I have as much sense as you have; he (Goodman) said, 'No you have not half as much.' Zipperer said, 'Yes, I have as much sense as you,' and Goodman said, 'You have not such a damn thing.'" Witness, seeing they were getting out of humor, stepped between them and told them to stop that nonsense, and not make fools of themselves. Just as witness stepped between them, each "caught the other by the collar, each man had his hand on the other man." Witness was then near enough to shake hands with both of them. Witness could not say which took hold of the other first; they had each other by the coat at the same time; neither of them had a weapon in sight at that time. About the time they took hold of each other and witness stepped between them Zipperer said, "Take your hand off me." Both of them had their coats buttoned up, and as witness stepped between them each loosened the bottom of his coat and stepped back two steps, so as to make the distance between them eight or ten feet. Zipperer pulled his club from his left hip pocket and had it in his left hand. Goodman pulled his pistol from his holster, and "as quick as he pulled it out" shot Zipperer. They were still about eight

or ten feet from each other. After the shot witness grabbed. the pistol and, after something like a half minute, succeeded in taking it away from Goodman. When the pistol fired Zipperer dropped to his knees and said, "Oh! my wife and children!" or "My poor wife and children!" He said this about a second after the pistol fired. When the pistol fired Zipperer had nothing in his right hand; when he fell from his knees on his back after he was shot, witness saw a part of the barrel of his pistol exposed in his right hip pocket, the barrel pointing upwards. Zipperer made no effort to draw his pistol. Goodman and Zipperer both had on sack coats, which were long enough to conceal a pistol or club in the hip pocket. They both began to unbutton their coats about the same time; witness could not say which began first. Zipperer drew his club about the same time Goodman drew his pistol; witness could not say which was drawn first, the club or the pistol. Zipperer had the club in his left hand a few seconds before he was shot; "it was all done as quick as a wink." Policemen in Savannah are required to carry loaded pistols. The shot fired by Goodman killed Zipperer.

The accused introduced no testimony, but made the following statement: "On the 29th of September I was standing in the driveway at the union station, talking to officers Zipperer, Malphus, and Sergeant Davis. We were talking there about negro drummers around the depot. Officer Zipperer said that he would arrest them every chance that he got. I told him that there was no use to do that; that a man could handle them without arresting them, and that I would not arrest them unless they were obstructing the sidewalk. He said that he would. I said 'Any man can handle a crowd of negroes without arresting them.' He said he could not; and I said, 'You can if you have any sense.' He said 'You are a God damn fool.' So then I threw my left hand on his breast and he threw his right hand to my breast and reached with his left hand for his club. Mr. Malphus stepped between and pushed us back, and said, 'Don't have a fuss,' and as Zipperer stepped back he threw his hand to his right hip-pocket that way [indicating], and tried to pull his gun. It seems that he made a second attempt. As I seen Malphus between he and I, I tried to strike him on the right shoulder to try to disable him from using his gun. I thought he was going to shoot me is the reason I

shot him.  Mr. Malphus asked me to give him my pistol I still held, and I called Malphus's attention, 'Don't you see that man trying to shoot me?'  He then took the pistol sticking out of Officer Zipperer's hip-pocket, about that position [indicating].  It seemed that when he pulled at it the hammer caught and he couldn't get it out of his pocket, and as he lay his hand dropped away from the pistol."  Malphus testified, in rebuttal, " I didn't hear Mr. Zipperer use the expression, ' You are a God damn fool.' He didn't use it.''

The first two grounds of the motion for new trial were that the verdict was contrary to law and the evidence.  The other grounds were as follows:

" 3. The court erred in charging the jury concerning voluntary manslaughter.

" 4. Because the court erred in admitting, against the objection of defendant, then and there made, that the evidence was irrelevant and would illustrate no issue in the case, testimony from the witness Malphus, that, immediately after the deceased had been shot and had fallen, the only words that he uttered were, ' O, Lord, my poor wife and children ! '

" 5. Because the court erred, against the objections of defendant's counsel, in permitting the solicitor-general, in his argument to the jury, to comment upon this language, as he did do more than once.

" 6. Because the court erred in not declaring a mistrial, when thereto requested by the defendant's attorneys, because of the statement made by the solicitor-general to the jury to the effect that the deceased had left four fatherless children.  This motion for a mistrial was made after the solicitor-general had, for the fourth time, mentioned this as a fact and as a part of an earnest appeal to the jury.  Up to this time nothing had been said as to this statement, by the court or the defendant's attorneys.  When the motion for a mistrial was made, the solicitor-general said he would withdraw the remark, and the court instructed the jury not to consider what had been said about four fatherless children. The court overruled the motion without further comment.  There was no further allusion to the matter by the court.

" 7. Because of the prejudicial statement by the solicitor-general, set forth in the 6th ground, in his argument to the jury

several times made, to the effect that the deceased had left four fatherless children, there being no evidence as to this, and such a statement being calculated to injure the defendant.

" 8. Because the court erred in charging the jury as follows: 'If you believe from the evidence that the defendant was the aggressor and that he had causelessly laid hands on the deceased, and if you believe that after this the deceased drew his club, and if you believe that this was an act of preparation on the part of the deceased only to resist further aggression, in that event the act of preparation only, if such you find it to be, can not be alleged by the accused as a sufficient provocation for the homicide,' said charge being unauthorized by the evidence. The court after this charge added, 'It may, however, be considered by you, along with the other facts and circumstances of the case, in determining whether the defendant acted under the fears of a reasonable man in what you may find he did.'

" 9. Because the court erred in charging the jury as follows: 'It should be voluntary manslaughter if you are satisfied that the facts and circumstances surrounding the accused were such as to excite the fears of a reasonable man that some bodily harm less than a felony was imminent and impending. It would be murder if the circumstances were not such as to excite the fears of a reasonable man that he was in any serious danger at all.' The said charge being illegal and not authorized by the evidence or the theory of either the prosecution or the defense during the argument, — the defense contending that the circumstances were such as to justify the fears of a reasonable man that his life was in danger, and the State that the defendant was guilty of the offense charged.

" 10. Because of the new evidence disclosed in the affidavits of Samuel Russell, Samuel Thomas, Henry Jenkins, Albert L. Jones, C. C. McEvoy, and J. H. Herring, here to the court shown."

*Adams & Adams* and *R. L. Colding*, for plaintiff in error.
*W. W. Osborne, solicitor-general*, contra.

FISH, P. J.　1. The law of voluntary manslaughter was clearly applicable to some phases of the case. There was evidence from which the jury could find that there was a sudden altercation between the accused and the deceased, during which each caught the other by the collar, it not appearing who caught the other

first; that when separated both began at once to unbutton their coats for the purpose of drawing weapons; that both drew weapons about the same time, the accused a pistol and the deceased a policeman's club ; that the accused shot the deceased immediately after drawing the pistol; that each had assaulted the other ; that both were in a sudden heat of passion; and there was a mutual intention to fight on the spot.    If such were the facts, it needs no argument or citation of authority to sustain the proposition that a charge on the law of voluntary manslaughter was appropriate.    We are also of the opinion that, in view of the evidence and the statement of the accused, the charge complained of in the 9th ground of the motion for a new trial was applicable. The portion of the charge excepted to was: " It should be voluntary manslaughter if you are satisfied that the facts and circumstances surrounding the accused were such as to excite the fears of a reasonable man that some bodily harm less than a felony was imminent or impending." The accused shot just as the deceased had drawn a policeman's club from his pocket and had it in his hand.    What his purpose was in drawing it and what he intended to do with it or was in the act of doing with it was for the jury to decide.    It was also for them to judge of the character of the club as a weapon, whether deadly or not; and, if the deceased was about to assault the accused, the character of the assault, whether less than a felony or not.    The jury, considering all the circumstances of the case, might have believed that the deceased, after the separation, still intended to fight, and when shot was in the act of making an assault and that such assault was not felonious.

2. Did the court err in admitting in evidence what the deceased said as he fell after being shot, viz., " O, Lord, my poor wife and children ?"    The contention for the State is that the words were admissible as part of the res gestæ and as tending to show the state of mind of the deceased at the time he was shot, and that, as the accused claimed that the deceased was the aggressor, that he was actuated by malice toward the accused and intended to do him harm, the exclamation of the deceased, made immediately after he was shot and as he fell to his knees, and before a change of mind was likely to have resulted, indicated that he had no malice in his heart, but was actuated solely by

motives of self-defense in what he was doing when he was shot. On the other hand, the contention for the accused is, that the words did not tend to illustrate any issue in the case, that they shed no light on the frame of mind of the deceased, that a violent man might force an issue, show a murderous purpose, and when shot down might, under a revulsion, which may come in the twinkling of an eye, refer in pathetic terms to his wife and children, but that such a reference could not aid the jury in arriving at the truth of the case, and that the words used by the deceased in the present case did not tend to show that when shot it was not his purpose to kill the accused. "Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, are admissible in evidence as part of the res gestæ." Penal Code, § 998. "Res gestæ are the circumstances, acts, or declarations which grow out of the main fact, are contemporaneous with it, and serve to illustrate its character." "An indispensable characteristic of declarations is that they must be made at the time of the act done which they are supposed to characterize, and further they must be calculated to unfold the nature and quality of the facts they are intended to explain, and so to harmonize with them as obviously to constitute one transaction." *Carter* v. *Buchannon*, 3 *Ga.* 513; *Mitchum* v. *State*, 11 *Ga.* 615, 623. "Acts are pertinent if they are done pending the enterprise, and whilst it is in continuous progress to its catastrophe, and are of a nature to promote or obstruct, advance or retard, or to evince essential motive or purpose in reference to it; and declarations are pertinent if they are uttered contemporaneously with pertinent acts, and serve to account for, qualify, or explain them, and are apparently natural and spontaneous." *Cox* v. *State*, 64 *Ga.* 374 (7). There are many other decisions of this court to the same effect. In *Travelers Ins. Co.* v. *Sheppard*, 85 *Ga.* 751, it was said that the code section above quoted introduces no new rule, and reference is approvingly made to the "luminous and able opinion of Judge Nisbet in *Mitchum* v. *State*, 11 *Ga.* 615." "When an act is done, to which it is necessary to ascribe a motive, it is always considered that what is said at the time, from which the motive may be collected, is part of the res gestæ." *Monroe* v. *State*, 5 *Ga.* 85. We are not prepared to hold that the sayings or exclamations of the deceased, made immediately after he was shot, did not tend to show the state of

his mind towards the accused immediately prior thereto, or that they were not calculated to illustrate the character of his acts just before he was shot.    We therefore rule that the court did not err in admitting them.    At most we think it could only be said that their admissibility was doubtful, and it has long been the rule in this State, when the admissibility of evidence is doubtful, to admit it and leave its weight and effect to be determined by the jury.    *Mitchell* v. *State,* 71 *Ga.* 128; *Augusta Factory* v. *Barnes,* 72 *Ga.* 217; *Dalton* v. *Drake,* 75 *Ga.* 115; *Central R. Co.* v. *Smith,* 76 *Ga.* 209; *Gilmer* v. *Atlanta,* 77 *Ga.* 638; *Thompson* v. *Thompson,* Id. 700; *Savannah R. Co.* v. *Flannagan,* 82 *Ga.* 579; *Western R. Co.* v. *Young,* 83 *Ga.* 512; *Central R. Co.* v. *Bernstein,* 113 *Ga.* 175.    If the evidence were properly admitted, then of course counsel for the State had the right to make legitimate comments on it in his argument to the jury.    In the 5th ground of the motion for a new trial, where complaint was made because the court allowed the solicitor-general to comment on the evidence we have been considering, it does not appear but that his comments were entirely legitimate.

3. It was not error to refuse to grant a mistrial on the ground that the solicitor-general, in arguing the case to the jury, stated that "the deceased had left four fatherless children." It is stated in the motion (6th ground) that the "motion for a mistrial was made after the solicitor-general had, for the fourth time, mentioned this as a fact and as part of an earnest appeal to the jury." What the appeal was does not appear from the motion; so we can only rule upon the question made, that is, whether the court erred in refusing to grant a mistrial because of the statement made by the solicitor-general, that "the deceased left four fatherless children." It appears from the motion for new trial that when the motion for a mistrial was made the solicitor-general withdrew the objectionable remark, and that the court instructed the jury not to consider what had been said about four fatherless children. Whatever influence, harmful to the accused, the remark of the solicitor-general was calculated to have on the minds of the jury was, we think, removed by the positive instruction by the court to the jury on the subject.

4. The exception to the charge set out in the 8th ground of the motion was not well taken.    Considering both the evidence and

the statement of the accused, there was room for the theory that the accused was the aggressor and that the deceased, in drawing his club, was only intending to resist further aggressions.   Granting, however, that there was nothing either in the evidence or the statement to authorize the charge, it would not be cause for a new trial, as the court instructed the jury that if they believed such theory to be true, then the drawing of the club by the deceased would not be "a sufficient provocation for the homicide."   The court was then dealing with the law of murder; and as the verdict was for voluntary manslaughter, this instruction on the law of murder, if erroneous, could not have been harmful to the accused, and was not cause for a new trial.

5. The alleged newly discovered evidence was not cause for a new trial.   It appears from the affidavit of counsel for the accused that three of the six witnesses who made affidavits as to the newly discovered evidence were present at the trial, and that counsel for the accused then knew what one of them would testify, and had heard that the testimony of the other two present would be favorable to the accused.   It further appears that the other three witnesses, of whose testimony neither the accused nor his counsel had any intimation prior to the trial, would testify to substantially the same facts as the three witnesses present at the trial, and that the testimony of all six witnesses was practically the same.   In *Norman* v. *Goode*, 121 *Ga.* 449, it was held:   "A party is bound, at his' peril, to submit on the trial all competent evidence in his favor he has at hand.   If he had knowledge of the fact, and the same could have been proved at the trial by evidence other than that newly discovered, a new trial will not be granted, unless the movant can satisfactorily explain why he did not attempt to use the evidence then at hand."   No satisfactory reason was given in the present case why the accused did not attempt to use the evidence of the three witnesses present at the trial.   It is due to counsel who appeared for the accused before this court to say that he candidly stated in his argument that in his opinion the alleged newly discovered evidence was not of itself sufficient cause for the grant of a new trial.

6. The evidence authorized the verdict, and the court did not abuse its discretion in refusing a new trial.

*Judgment affirmed.   All the Justices concur.*

SIMMONS, C. J.   I concur in the judgment, but dissent from the view expressed in the second headnote.