25484.   NEW YORK LIFE INSURANCE COMPANY *v.* ITTNER.

DECIDED DECEMBER 3, 1936.

*George L. Sabados, Bryan, Middlebrooks & Carter,* for plaintiff in error.

*Leonard Farkas, Walter H. Burt, Bennet & Peacock,* contra.

BROYLES, C. J.   Mrs. Ittner brought suit against the New York Life Insurance Company on a policy of insurance, seeking a recovery under the terms of the double-indemnity provision thereof. The policy was issued by the defendant on the life of Ittner, the plaintiff's husband, and she was named therein as the beneficiary. Before the filing of the suit the defendant had paid to the beneficiary the face amount of the policy, thereby discharging its obligation under the single-indemnity provision of the policy.   The material parts of the double-indemnity provision are as follows: "New York Life Insurance Company  .  .  agrees to pay to the .  .  beneficiary  .  .  $5000 (double the face of this policy) upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means  .  . The provision for double indemnity  .  .  will not apply if the insured's death resulted from self-destruction, whether sane or insane." Under the pleadings and the evidence adduced on the trial, the sole issue was whether Ittner had committed suicide. The defendant contended that the evidence authorized and demanded a finding that he had intentionally taken his own life, while the plaintiff insisted that the evidence amply authorized the jury to find that Ittner's death resulted from bodily injuries inflicted on him, either accidentally or intentionally, by unknown persons.   A verdict in favor of the plaintiff was returned.   A new trial was denied, and the defendant excepted.

The brief of evidence in the transcript of the record, shows, among other things, the following undisputed facts: Ittner was a contractor, and resided in Albany, Georgia. At the time of his death he was building a court-house for Telfair County in McRae, Georgia. On the morning of September 5, 1934, he left his home, and his wife thought he was going to McRae to look after the court-house job there. He never arrived at McRae; and on the afternoon of September 7, 1934, his automobile was found at Ossiwichie Springs, at the end of the road leading to the springs, and near the Ossiwichie swamp of the Ocmulgee river. This road leads off the Fitzgerald-Abbeville highway, and the end of the road where the car was found is about one and a half miles from that highway. The car had been turned around, and when found it faced the Fitzgerald-Abbeville highway. The ignition of the car was locked, and the key thereto was subsequently found in the pocket of the dead man. There were no signs of any struggle or violence around the car.' On the following morning, September 8, Ittner's lifeless body was found in the swamp, about two or three hundred yards distant from his car. The following wounds were found on Ittner's body: three long gashes on his throat, apparently made with a razor, and sufficient to cause his death; numerous stab wounds, apparently made with a pocket-knife, in his arms, legs, and abdomen. The stabs in the legs were in the calves between the knees and the ankles, there being three or four stabs in each leg. There were stab wounds on both arms between the wrists and the elbows. A blood-stained pocket-knife was on the ground near the body, and a blood-stained razor was under a log, some little distance from the body. The gashes in the throat appeared to have been made by a "straight" razor, such as the blood-stained razor; and the stab wounds in the arms, legs, and abdomen were apparently made with a pocket-knife similar to the one found near the body. Ittner's shirt and collar were hanging on a bush and had no cuts on them, and the collar-button was in his pocket. In his pockets were also found the keys to his car, his watch, rings, and nineteen dollars and some cents. The body was lying on the ground, with the face downward, and the belt had been removed from the trousers and put around the neck. The belt had been twisted several times around a stave or piece of wood, like a tourniquet, and drawn tightly to the choking point

around the neck. A handkerchief was between the neck and the belt. A sock had been removed from one foot, and the shoe replaced thereon, laced, and tied, without replacing the sock on the foot. The missing sock was found a short distance from the body. The sock was bloody, and apparently it had been used for the purpose of stopping the flow of blood from some of the body wounds. Several bruises were on the body, apparently made by some blunt instrument; there was a bruise on the jaw, the temple, the forehead, and back of the left ear; and some of the witnesses for the plaintiff testified that in their opinion some of these licks or bruises could not have been made by Ittner. An investigation of the death was made by Sheriff Smith of the county in which the body was found, and by the sheriffs of Telfair and Ben Hill counties. A coroner's jury also made an investigation. No effort was made by any of the peace officers to apprehend any person for the killing or for the murder of Ittner; nor was any reward offered by such officers, or by Ittner's family, for the arrest of the killer or murderer. It was further shown that the deceased had a friendly disposition, was well liked by everybody who knew him, and, so far as known, had no enemies.

It will be seen that the foregoing evidence strongly supports the theory of the insurance company that Ittner committed suicide. The company, in further support of this theory, offered the testimony of several physicians of Atlanta, to the effect that in 1924 Ittner was a patient in Wesley Memorial Hospital; that his case was diagnosed as one of syphilis, and he was there treated for that disease; that while in the hospital he went into a bathroom and attempted to commit suicide by cutting, with a razor, his throat, arms, wrists, legs, and abdomen; that at the time he was very depressed in spirits and was suffering from melancholia, and when asked why he cut himself he replied that he wanted to die; that he was at the same time treated for dementia, accompanied by syphilitic infection; that he had a suicidal tendency and syphilis of the brain; that when a person has syphilis of the brain, permanent scar tissues are formed in the brain, and that condition "causes the thing that initiates those [abnormal] actions in a man, which would cause him to destroy himself." One of the doctors testified: "I expect the suicidal tendency to repeat itself in five or ten years, in a case of a man who has had syphilis, due to the syphilis," and

"as a doctor familiar with Mr. Ittner's case, I would expect this suicidal tendency to manifest itself. I would not be surprised if it did manifest itself at a period of ten or twelve years after the occurrence at Wesley Memorial Hospital, or even longer." All of the foregoing testimony was excluded on the grounds that it was immaterial, irrelevant, and too remote in point of time as to the different circumstances of Ittner in 1924 and at the time of his death. In our opinion the rejected evidence was material and relevant to the issue, and was not too remote to be considered by the jury. The remoteness of testimony does not affect its competency, but goes merely to its weight and the importance to be given it by the jury. Boyd *v.* State, 82 Tenn. 161 (6); Blackburn *v.* State, 23 Ohio, 146 (7); Benjamin *v.* District Grand Lodge, 171 Cal. 260 (152 Pac. 731); Wigmore on Evidence (2d ed.), § 143; 2 Jones on Evidence (2d ed.), § 726. Moreover, in the instant case, the rejected evidence as to Ittner's former attempt to commit suicide was material and relevant, because it disclosed that the method adopted by him in such attempt to take his life was a most unusual one, and also that the stabs or cuts then inflicted by him on his person were substantially similar to those found on his dead body.

In view of the entire testimony of Dr. Gaines, as set out in the motion for new trial, there was no merit in the objection to that portion of his testimony which related to the history of Ittner's former ailments and his conduct in relation thereto, as recited to Dr. Gaines by a friend of Ittner in Ittner's presence and hearing. The ground of the objection was that it did not definitely appear from Dr. Gaines's testimony that Ittner fully understood or heard the history as so recited. We think the evidence of Dr. Gaines sufficiently showed that Ittner heard the history of his case as related by his friend in Ittner's presence, and acquiesced thereto by his failure to deny any of the historical statements so related. Furthermore, even if the admissibility of the evidence were doubtful, it is a well-settled rule that when the admissibility of evidence is doubtful it should be admitted and its weight and effect left to the jury. *Goodman* v. *State,* 122 *Ga.* 111(2), 118 (49 S. E. 922), and cit.; *Purser* v. *McNair,* 153 *Ga.* 405 (2), 411 (112 S. E. 648); and cit.; *Booth* v. *State,* 160 *Ga.* 271, 279 (127 S. E. 733), and cit.; *Standard Oil Co.* v. *Reagan,* 15 *Ga. App.*

718

571, 582 (84 S. E. 69); *Smith* v. *State*, 23 *Ga. App.* 76 (97 S. E. 454); *McClelland* v. *State*, 27 *Ga. App.* 783 (3) (110 S. E. 245). This ruling is applicable also to the rejection of the evidence set forth in grounds 7, 8, and 28 of the motion for new trial. That evidence, even if of doubtful admissibility, should have been admitted and its weight and effect left for the determination of the jury. Under the foregoing rulings, we hold that the court erred in excluding the evidence set forth in grounds 7, 8, 9, and 28 of the motion for new trial. Ground 29, complaining of the exclusion of Wesley Memorial Hospital's record of the Ittner case, fails to show that such exclusion was erroneous. Part of the record consisted of several letters signed by employees, or ex-employees, of the hospital. Each letter was addressed "To whom it may concern," and contained statements which, in effect, amounted to hearsay evidence. Furthermore, the statements were not made under oath or affirmation. See, in this connection, *Mutual Benefit Health &c. Asso.* v. *Bell*, 49 *Ga. App.* 640 (4), 651 (176 S. E. 124), and cit. The remaining special assignments of error are without substantial merit; and the question as to the sufficiency of the evidence to support the verdict is not passed on. The court erred in overruling the motion for new trial.

*Judgment reversed. MacIntyre and Guerry, JJ., concur.*