### 28716.   NEW YORK LIFE INSURANCE COMPANY *v.* ITTNER.

DECIDED APRIL 4, 1941.

*George L. Sabados, Bryan, Middlebrooks & Carter,* for plaintiff in error.

*Bennet & Peacock, Farkas & Burt,* contra.

STEPHENS, P. J.   Mrs. Ethel Bush Ittner sued the New York Life Insurance Company on an insurance policy to recover double-indemnity benefits, her petition alleging that the death of the insured resulted directly and independently of all other causes from bodily injury effected through external, violent, and accidental

means. The defendant filed an answer in which it denied the allegations of the petition and contended that the death was due to suicide. The jury found for the plaintiff the amount of the double indemnity, and $350 attorney's fees. The defendant moved for a new trial on the general grounds, and by amendment added certain special grounds. The court overruled the motion, and the defendant excepted.

■ Was the evidence sufficient to authorize the jury to find that the plaintiff had carried the burden of proof of showing that the death of her husband was the result, directly and independently of all other causes, of "bodily injury effected solely through external, violent, and accidental causes?" In other words, did the deceased meet a violent death which was not inflicted by himself with suicidal intent? The evidence adduced was voluminous. From it appears the following: The plaintiff is the beneficiary under a policy of life insurance, in which her husband was the insured, which provided for the payment of double indemnity "upon receipt of due proof that the death of the insured resulted, directly or independently of all other causes, from bodily injury effected solely through external, violent, and accidental causes." The insured was a contractor, and lived in Albany, Georgia. On the morning of September 5, 1934, he left Albany, apparently to go to McRae, Georgia, where he was building the court-house. Thereafter, on September 7, his automobile was found at the end of a dirt road leading into a dense swamp. A search was instituted, and the next morning his body was found in this swamp, several hundred yards from where his car was found. The body was found lying face down in an open space within the swamp. He had been dead for some time, as the body was beginning to putrefy. There were many wounds, cuts, gashes, bruises, and stabs on his body. There were three deep gashes in his throat. He had been stabbed in the back of his neck. When his car was found the ignition was locked. The car window was down, but the door was not locked. In the car was an overnight suitcase belonging to him, and some letters addressed to him. A witness for the defendant testified that there were no tracks or blood around the automobile.

A witness for the plaintiff testified, as to finding the body, as follows: "There was an old tree cut there, and he was laying straight out on his stomach with his foots toward that stump and

with his head elevated up, with a·stick. . . Across one side of his face, and a belt, one of these patent belts that goes around a man's body, that was right around his neck it was twisted in a way, you could stick that piece of timber through there, and one end was sticking out just so. . . One edge of that stick was kinder on the ground, and the other end was elevated just enough to hold his head up. That was twisted right round his neck and then the gash was cut there too. It was pretty tight. The belt was pressed over the gash. You could see the gash from the conditions there. . . It was under the belt. I was there when the belt was removed from the neck. I saw the gashes. Them gashes in the neck—well it didn't look to be but one solid, straight gash. . . That gash was near bout round his neck. . . It was pretty deep. . . I would say four and one-half or five inches long. . . I saw the tree where some blood was. That tree from where us found the body . . would be about ninety feet. It was a well-defined trail from where I first saw that tree to where I found the body. I found blood at that tree. . . As to what I found at this tree, I finds the palm of a man's hand on a oak tree, . . a big place of blood to the right of that tree, and the palm of his hand on that tree. More blood was found right there than anywhere else. It must have been . . near about a quart . . of what Dr. McRimmon used to tell me was life's blood. . . It was just a little bit of blood all along till it got right where he was laying out in that mud hole, and where his throat was cut it want much blood. . . I couldn't see any tracks. It just looked like it had been trampled, but I couldn't see no trace of tracks from different places. I was there when the razor was found. It was found under a little log that was laying cross the path between this oak tree and the body of this gentleman. . . I tell you that razor was laying down under the side of that log, and I didn't see but just a little skim of blood on that razor—a little blood looked like, was right on the handle of the razor, the back end of it. From my investigation out there, from what I found there, the blood at those various places, the cuts on the body, based on those facts I found there and which I have testified to, in my opinion Mr. Ittner, the man whose body I found there, could not have inflicted those wounds on himself."

John Hamilton testified for the plaintiff: "When I walked up

to the body there, he was laying face down, as near flat on the stomach as he could be, with the belt twisted around his neck and a stave board in that belt, twisted several times; there was blood about the body there, and there was gashes on his throat, and a slash, or stab or gash on the back of his neck, and further investigation showed stabs. I would say there were thirty-five or forty stabs on different parts of his body. . . I made some investigation of the surrounding territory. I located points from the body where I found blood. The farthest point from the body where I found it was between seventy-five and a hundred steps—that would be yards. . . When I first discovered that place where I found the blood, it was mashed down there, and we traced it right on down to seventy-five or one hundred steps to where we found Mr. Ittner's body. There was some briars there all mashed down. I don't know whether they had been tussling, or falling around, or scuffling, but they was mashed all down, and I was there at the time the sheriff and the deputy sheriff found the razor back of the log, away from Mr. Ittner's body. The razor was stuck back of the log, fifteen or twenty feet from the body. That space for the razor there between the log and the ground was two or three inches. It was placed there, it wasn't just throwed there by somebody. Between the point where I found the first blood and the place where I found the body I saw signs of blood. Three or four places. There was a good bit of blood. There was a road, but the trail of blood was out of the path in the briars, around about there, it looked like where he wallowed around or tussled around. I found three or four places indicating wallowing or tussling. At one place I found a hat back of some briars. . . I don't know whose hat it was. . . I found a knife, and I found fifteen cents in change at one place, and at one place I found a shirt, . . and a sock with blood on it. . . In my opinion, I do not think he could have cut himself after twisting that belt around his neck without cutting that belt, because the belt was twisted there, and he had fallen there; he was down on a stob, a stave, and that blood was twisted real tight, and that stave was through it and twisted; but I sure believe he was cut before it was put there; that is the reason for my opinion. If a man, from the first point I found blood, was cut three times in the neck, the wounds being two inches deep and three inches long, and being on the right and the left side, and

across the front of the neck, and he had traveled over that path that I found there that he had went over, in my opinion he could not, after reaching the point where I found the body, have taken the belt, put it around his neck, taken the stave, put it in the belt and twisted it around his neck. My reason is, from the loss of blood and the point he came from, it looks impossible; there was three gashes, one on each side and one across the front, and they was wide open. I didn't notice Mr. Ittner's body very closely. . . I saw a definitely defined line from where I found the body to where the first trace of blood going north. Between points there was a well-defined line, with now and then a place where there had been tussling or wallowing or something of the kind. The log where the razor was found was right back in here, ten or twelve feet from that line. There was not any sign of trampling or tussling or any sign of blood around the log where the razor was found. . ."

The embalmer who had charge of the body testified for the plaintiff, in part, as follows: "On the examination of this body, as to whether I discovered any wound in the base of the skull, the wound in the back of Mr. Ittner's head was right in the back of the neck, in the collar. . . It was about an inch deep. It was a stab wound of some sharp instrument. . . It went straight in and straight out. It was a very clean wound in the neck, a very clean stab wound. It was not jagged. It was very smooth. From what I found there, the location of the wound, the nature of it, based on those facts alone, I do not think Mr. Ittner could have inflicted that wound on himself. Mr. Ittner was a very large man, and he had an enormous neck, a very enormous neck, and there was three distinct cuts and slashes on his neck. There was one on the left side. There was one on the left side, along here; then one on the right side, about here; then one across the center of the throat, very deep, and about that long [indicating about three inches]; they were at least three inches on each side of the neck, and probably two inches in front, and they must have been at least an inch or more deep, all of them, and they were across his neck, like that. . . I found some bruises or marks on his face and in the rear of the left ear here. On the chin, right in here, there was a very bad bruise across his chin. . . The first thing we do in embalming a body is to close the mouth and eyes; and in closing the

mouth, I saw a very deep bruise across the chin. There was a very, very deep bruise on there. . . I investigated that wound; it was a deep bruise across the chin, all across here, and the left jaw, in closing it I found this jaw was broken [indicating the left lower jaw]. It clicked distinctly. I found a bruise on his temple. . . He was bruised all over. . . From what I found there, the evidence that I saw, based upon my experience which I have had in handling bodies, I would say that the injuries I found on the jaw and the temple, either one of them, was sufficient to knock a man unconscious, to cause him to become unconscious. . . He was cut practically all over the body. I don't remember the exact number of cuts now, but there was fifty some odd different distinct cuts or stabs on his body, ranging from the calf of his legs, over his abdomen, his arms, his head, his back, his neck, and all over his body. I embalmed that body."

There was testimony to the effect that the insured, shortly before his body was found, and also on the day that he left Albany to go to McRae, appeared to be cheerful and in good spirits. Doctors McKemie and Keaton and other witnesses testified that they examined the body and observed the cuts and bruises, and that from their investigation the deceased could not, in their opinion, have inflicted the bruises over the temple, forehead, and jaw, and then inflicted the wounds in the throat; and that this was particularly true after having bled profusely at a point eighty or ninety feet from where his body was found with his throat cut, as described by the witnesses who found the body.

The evidence was sufficient to authorize the jury to find that the death of the insured was not the result of suicide, but was effected solely through "violent, external, and accidental causes." The verdict found for the plaintiff for the double indemnity provided for in the policy was authorized.

■ Over objection of the defendant the trial court admitted in evidence the proof of death made by the plaintiff to the defendant, in which was incorporated a copy of the certificate of death required under the vital-statistics law, and which contained a copy of the verdict of the coroner's jury in the matter of the inquest into the death of the insured, which verdict stated: "We, the jury, after a thorough investigation, find that Arthur Ittner came to his death from the hands of unknown parties." The objection to the admis-

sion of this evidence was that there had been a stipulation dictated into the record at the outset, with reference to the furnishing of proof of loss and the making of the demand for payment; so that there was no dispute about the fact that proof of loss had been furnished, and that demand for payment was made more than sixty days before the filing of the suit; and therefore that the evidence was irrelevant and immaterial to any issue, and that the proofs which were tendered were irrelevant and immaterial to any issue, and were not proof of any fact stated therein; that the admission of the evidence was prejudicial, in that such proofs had attached thereto copies of the certificate of death, which contained highly prejudicial matter relating to the verdict of the coroner's jury. It appears, as a recital of fact in this ground of the motion for new trial, as follows: "It is agreed, with reference to case No. 8761, Mrs. Ethel Bush Ittner *v.* New York Life Insurance Company, and admitted by counsel for the defendant, that proof of loss was submitted by the plaintiff in said cause, and, after the expiration of 60 days, demand for payment was made, and that suit was not filed until 60 days after said last demand. In this connection the defendant insurance company does not admit that the proof of loss thus made was sufficient and satisfactory to the defendant insurance company." Error is assigned on the admission of this evidence, upon the grounds urged.

The death certificate was attached to and made a part of the proof of death submitted to the defendant. If the fact of the furnishing of the proof of death and the contents thereof were admissible in evidence, the certificate of death attached thereto as a part thereof would seem also to be admissible. The mere fact that the parties had agreed and stipulated that proof of death had been made would not necessarily render the written proof of death submitted to the company, together with its necessary concomitants, irrelevant and inadmissible. In regard to the stipulation and admission by counsel that proof of death had been submitted by the plaintiff, it was also stipulated that the "defendant insurance company does not admit that the proof of loss thus made was sufficient and satisfactory to the defendant insurance company." By reason of this latter restriction and limitation on the stipulation that the proof of death had been submitted by the plaintiff, it does not seem that the plaintiff should be precluded from showing that she had

made a legal and sufficient proof of death by offering in evidence the proof which the plaintiff had actually made. Evidence as to the proof of death, containing the death certificate attached, was certainly not irrelevant and not inadmissible, unless it was harmful and prejudicial to the defendant and for that reason was illegally admitted.

The certificate of death, attached to the proof of death required under the policy, purported to be the certificate of death required under the vital-statistics law as embodied in the Code, §§ 88-1214, 88-1215. It appears from the provisions of § 20 of the act (Code, § 88-1212) that such certificate "shall be prima facie evidence in all courts and places of the facts therein stated." It is contended that the contents of the verdict of a coroner's jury are not proper matter for incorporation in the death certificate required under the vital-statistics law, and therefore that the death certificate when introduced in evidence, as provided by law, would not be evidence as to the cause of death as expressed in the verdict of the coroner's jury. However this may be, there was attached to the proof of death, furnished to the defendant by the plaintiff, a copy of the certificate of death issued under the authority of the vital-statistics act; and it was not error to admit in evidence such proof of death because a copy of the certificate of death issued under the authority of the vital-statistics act may have contained matter unauthorized by the act, namely, a copy of the verdict of the coroner's jury. Whether or not a copy of the verdict of the coroner's jury could legally be incorporated in the certificate of death, it was in fact a part thereof, and the certificate of death with the verdict of the coroner's jury inserted therein was prepared and issued by the officials authorized under the vital-statistics act to issue such certificate. The certificate of death as thus prepared, and as being a part of the proof of death, must necessarily ride on the proof of death; and if the proof of death was admissible in evidence, all component parts thereof, including a copy of this certificate of death, were admissible. The admission in evidence of the proof of death with the copy of the certificate of death issued under the authority of the vital-statistics act, where the proof of death was admissible, can not be held to be error on the ground that there may have been contained in the certificate of death a copy of the verdict of the coroner's jury, where the judge expressly instructed

the jury that the proof of death was admitted for the purpose of showing that such proof had been made, and not for the purpose of establishing the truth of any of the recitals in the certificate, and instructed the jury not to "consider the affidavits embraced in the proof of loss as evidence in your consideration and determination of these causes." In 13 C. J. 1256, it is stated: "By the weight of authority, however, while such verdict [verdict of the coroner's jury] is competent to be received in evidence as part of the proof that the death of the insured occurred, it is not even prima facie competent as tending to prove the cause of such death." In *Supreme Council of the Royal Arcanum* v. *Quarles,* 23 *Ga. App.* 104 (97 S. E. 557), it was said that the verdict of a coroner's jury may be received in evidence as part of the proof of death of the insured, but it was held in that case that the verdict as such was not "prima facie competent as tending to prove the *cause* of death," and that the verdict was properly excluded.

■ The court elsewhere admitted in evidence, over objection of the defendant, the certificate of death issued under the authority of the vital-statistics law. This certificate of death contained a recital of the verdict of the coroner's jury, which has already been quoted. Counsel for the defendant objected to this evidence, on the ground, that, in so far as it contained the verdict of the coroner's jury, it was not made out in conformity to the statute authorizing such certificate, as appears in the Code, § 88-1214; that the law relating to death certificates does not provide that the verdict of a coroner's jury should appear therein. Counsel for the defendant further objected on the ground that the fact of death had been admitted in the pleadings, and was undisputed, and that the only possible relevancy of the death certificate would be to get before the jury that portion of it with reference to the verdict of the coroner's jury, and that such verdict was not competent or admissible, and was not proper matter for consideration by the jury, and that the certificate of death was irrelevant and immaterial, and its admission was prejudicial to the defendant. In the motion for new trial the defendant excepted to the admission of this certificate, on the grounds urged. The vital-statistics act (Code, § 88-1214) provides that the certificate of death required by that act "shall contain the following items, and such other items as are deemed necessary for legal, social, and sanitary purposes subserved by registration records:"

Then follow an enumerated list of items which the certificate shall contain, among them being "certification as to medical attendance on decedent, fact and time of death, time last seen alive and cause of death." It further provides: "Causes of death which may be the result of either disease or violence shall be carefully defined; and if violence, the means of injury shall be stated, and whether (probably) accidental, suicidal, or homicidal." It is also provided in the next section (Code, § 88-1215), that in case of any death occurring without medical attention "if the registrar has reason to believe that the death may have been due to unlawful act or neglect, he shall then refer the case to the coroner or any other proper official for his investigation and certification," and that "the coroner or other proper official, whose duty it is to hold an inquest on the body of any deceased person, and to make the certificate of death required for a burial permit, shall state in his certificate the name of the disease causing the death, or, if from external causes, (1) the means of death, and (2) whether (probably) accidental, suicidal, or homicidal, and shall in any case furnish such information as may be required by the State Board of Health in order to classify the death properly."

Since this act provides that the certificate of death shall contain the cause of death, "carefully defined," either from disease or violence, and if from violence the means of injury shall be stated, and whether probably accidental or suicidal or homicidal, and since the act requires that the coroner, in making the certificate of death required for a burial permit, shall state in the certificate the means of death, and, if death is from external causes, whether probably accidental, suicidal, or homicidal, and shall furnish such information as may be required by the State Board of Health in order to classify the death properly, and since it is provided that the certificate of death shall contain, among enumerated items, such "other items as are deemed necessary for legal, social, and sanitary purposes subserved by registration records," it can not be said that the certificate of the coroner required by law, as to the cause and means of death and whether the death was accidental, suicidal or homicidal, which contained a recital of the verdict of the coroner's jury as to the means of death, was not a proper item necessary for legal or social purposes to be inserted in the certificate of death as to the cause of death, where the law re-

quires that the certificate shall contain a statement as to the cause of death, carefully defined, whether the death is the result of disease or violence, and, if violence, whether the death probably was accidental, suicidal or homicidal. The authorities preparing the certificate of death, having some latitude under the terms of the act as to what items should be contained in the certificate of death which must contain a statement as to the cause of death, are justified in inserting in the certificate, as evidence of the cause of death, the legally required certificate of the coroner as to the cause of death, although the coroner's certificate contained a copy of the verdict of the coroner's jury. Besides, this section of the Code requires that the certificate shall be made by the coroner or other proper official whose "duty it is to hold an inquest on the body of any deceased person," and that the case shall be referred to the coroner or other proper officer "for his investigation and certification." Since the case is referred to an officer whose duty it is to hold an inquest for investigation or certification, it would seem that an investigation made by him by holding an inquest, and impaneling a jury, which under the law, he has a right to do, and a certification by him of this investigation by showing the verdict rendered by the jury upon the inquest, could be accepted by the registrar as a compliance by him with his duty to certify as to the death of the deceased, and in his certificate state the cause of death. Since the act (Code, § 88-1212) provides that the certificate of death required under the act "shall be prima facie evidence in all courts and places of the facts therein stated," the certificate of death was properly admitted in evidence, and constituted prima facie evidence of the facts therein stated, including the fact, as recited in the verdict of the coroner's jury appearing in the certificate, that the deceased "Arthur Ittner came to his death from the hands of unknown parties." It follows that the court did not err in admitting in evidence, over objections urged by the defendant, the proof of death, with the certificate of death as a part thereof, and did not err in admitting in evidence the certificate of death required under the vital-statistics law, and which contained therein a copy of the verdict of the coroner's jury, over objections urged by the defendant.

The questions here presented have no reference to an admission in evidence of the verdict of a coroner's jury. They have

reference only to the admissibility in evidence of the proof of death and of the certificate of death required under the vital-statistics law. The provisions of the act of 1927, supra, making the certificate of death issued pursuant to the provisions of that act "prima facie evidence in all courts and places of the facts therein stated," supersedes anything to the contrary which may appear in *Haugabrook* v. *Metropolitan Life Insurance Co.*, 63 *Ga. App.* 829 (12 S. E. 2d, 163), which was decided without reference to this provision of the act. In that case it was held that since the fact of death was admitted and was not in issue, the certificate of death issued under authority of the vital-statistics act was properly excluded. In *Sovereign Camp W. O. W.* v. *Winn,* 23 *Ga. App.* 760 (99 S. E. 319), in which the court held that it was not error to exclude from evidence a portion of the record of the coroner's inquest containing testimony which showed that the death of the insured was caused by his own hand, it appears only that such testimony was excluded. There appears no question as to the admissibility of the certificate of death required by the vital-statistics act.

■ After the introduction of the certificate of death containing a copy of the verdict of the coroner's jury, the defendant offered the testimony of three members of the coroner's jury, that at the time of the inquest the jury had agreed on a verdict that the deceased met his death as the result of suicide, and would have rendered that verdict, but that it was suggested to them that on account of the grief of the deceased's widow the jury render a verdict other than that the deceased came to his death as the result of suicide, and that for this reason the jury rendered the verdict which they did, that the deceased "came to his death from the hands of unknown parties." The admission of this evidence was objected to by the plaintiff, on the grounds that it was irrelevant, immaterial, etc., and that it sought to impeach the verdict by the testimony of members of the jury which rendered the verdict, and that it was hearsay. The defendant excepted to the exclusion of this testimony on substantially the same grounds on which the defendant excepted to the exclusion of this testimony in the former trials of this case. It is sufficient to say that the question here raised respecting the exclusion of this testimony has been settled adversely to the defendant in the former decisions of this case, and therefore it is the law of this case as stated in those decisions

that such testimony was properly excluded. See *New York Life Insurance Co.* v. *Ittner,* 54 *Ga. App.* 714, 718 (188 S. E. 920), s. c. 59 *Ga. App.* 89 (200 S. E. 522) ; 62 *Ga. App.* 31, 36 (8 S. E. 2d, 582).

■ The court did not err in excluding the following question propounded to the witness Dix, who was a member of the coroner's jury holding the inquest into the death of the insured, together with the answer of the witness to such question: Q. "I will ask you, Mr. Dix, whether or not it was your opinion that the wounds which you saw on Mr. Ittner were self-inflicted, or whether they were inflicted by other parties?" A. "I thought it was self-inflicted." No facts were stated on which to base the answer to this question, and the answer was a mere conclusion of the witness.

■ The court did not err in overruling the defendant's motion to declare a mistrial, based on certain questions propounded by counsel for the plaintiff to a witness, as to whether the deceased could have inflicted on himself a certain bruise on his cheek, a bruise on his temple, and a bruise on his forehead, where, on objection, such questions were withdrawn by counsel for the plaintiff before they were answered by the witness, and where it appears from the record that the court instructed the jury to give no consideration to such questions in their deliberations.

■ It appearing without dispute from the evidence that from all the facts known to the defendant, after the claim had been submitted to it for adjustment, the defendant did not act in bad faith in failing to pay the claim, the jury was not authorized to find an amount representing attorney's fees. See Code, § 56-706. The judgment is affirmed on condition that the plaintiff write off from the verdict $350 found as attorney's fees. Otherwise the judgment will be reversed.

*Judgment affirmed on condition. Sutton, J., concurs.*

FELTON, J., dissenting. The evidence as contained in the brief thereof consists of 213 pages of oral and documentary evidence. It shows substantially the following:

The insured, a contractor living at Albany, Georgia, left his home on the morning of September 5, 1934, ostensibly to go to McRae, Georgia, where he was building a court-house. He was never seen alive after leaving Albany on the morning in question. On Friday, September 7, 1934, his car was found at the end of a

dirt road leading into a swamp, and on the following morning his body was found in the swamp several hundred yards from his car. The car was located about two miles off the paved road, and was at the end of the dead-end road, parked under a tree on the side of the road. The ignition of the automobile was locked, and the doors of the car were closed but not locked. There were no signs of any struggle at or near the car. In the car was an overnight suit-case belonging to the insured. In the suit-case was found a case which was variously testified to be a tooth-brush holder and a razor-case. Mrs. Ittner testified that it was an empty tooth-brush holder. Later she testified: "I didn't keep the case that might have been a razor case, or a tooth-brush case, or whatever it was." Also in the suit-case was a part of a pasteboard carton marked "Poison." This was explained by Mrs. Ittner by testifying that she had let the janitor at her apartment have a bottle of lysol, and that when it was returned by him it was opened by Mr. Ittner and placed in the bathroom, where it still was. She testified that the top of this carton was the one found in the suit-case. The body of the deceased showed that his throat had received three gashes which appeared to have been made with a razor. His legs, arms, and abdomen showed evidences of stab wounds, which appeared to have been made by a small sharp instrument. These wounds were in his legs between his knees and his ankles, on his arms between his wrists and his elbows, and in his abdomen in the region below the heart. There was some testimony that there was a stab wound in the back of his neck about one and a half inches deep, which appeared to have been made by a small sharp instrument, and which wound went straight in. Other testimony was that there was no stab wound in the back of his neck. There was a bruise on the left side of his face, but, other than the gashes and stab wounds, the skin was not broken on the body. The undertaker who prepared the body for burial testified that the left jaw was broken; but three doctors, who either performed or were present at the autopsy, after removing the skin from the jaw, testified that there was no fracture of the jaw.

Some distance from where the body was found there was a bloodstained razor, partially under a log away from the body of the deceased. There was testimony that it was clearly apparent that this log had been removed from its seat in the swamp. Nearer the

body was found a blood-stained pocket-knife. A small empty vial or bottle was found near the body. The shirt had been removed from the body, and was found hanging on a bush near by, as was the collar. The body was lying face downward, on the left side of the face. The belt of the deceased had been removed and placed around his neck, and through the loop so formed a long stave had been placed and so twisted that the belt tightened in such a manner as to choke him. Under the belt had been placed his handkerchief. One of his socks had been removed, and the shoe replaced without the sock. The sock, very bloody, was found a short distance from the body. In the pocket of the deceased were found his collar-button, the keys to his automobile, some $19, and his watch. A ring on his finger had not been bothered. It appeared from some of the witnesses that there was no blood where the body was found. Near the log where the razor was found there was blood. On a tree near by was a bloody handprint. There were drops of blood leading from there to where the body was found. The ground and underbrush were dry, and gave the appearance of having had a foot or a pole dragged through some oak leaves. Mrs. Ittner testified that on the morning the deceased left Albany "he did not give any evidence of any disturbances, or being angry with anybody. He did not appear to be disturbed or distressed about anything. He was more optimistic than he had been for several years. We had been married seven years. During that time he did not get drunk or intoxicated or drink liquor. He left me that morning in a perfectly good humor. Our domestic relations were perfectly pleasant." She further testified that when she was asked if she wanted some one to search for Mr. Ittner she replied: "No; if he has gone off and you go to try tracing him up, finding out where he is gone, when he comes back it is going to be too bad for whoever does it." Though Mr. Ittner had not smoked for years and refused to let anybody smoke on his job, he had recently started smoking. A few days before his death was reported, in a conversation with a witness, the deceased expressed regret at an occurrence which had happened between them. The witness testified that he was very glad Ittner had spoken to him, and that Ittner was very cheerful at the time. On the day he left he complimented a laundry boy on his honesty for returning some article to him.

Some ten years before Ittner's death he was sent to Atlanta by his physician for observation and treatment. His history as given to the doctor showed that he was subject to fits of melancholia and had been having distinct suicidal tendencies. He was admitted to Emory Hospital, and on examination it was found that he was suffering from syphilis, for which he was given intravenous injections. While he was in the hospital, and at a time when the doctor had ordered that he be not left alone for a minute, he eluded his nurse, locked himself in the bathroom, and with a razor which he had smuggled into the hospital cut himself in very much the same way he was cut when he was found dead. He was sewed up, and, after being in the hospital a while, was discharged as improved. The final diagnosis as shown by the hospital record was that he had tertiary syphilis and acute alcoholism. There was testimony that where syphilis and acute alcoholism were present, as in this case, a suicidal tendency was apparent in many cases; that this suicidal tendency and melancholia might recur at any time within five or ten years; and that if the syphilis remained uncured and treatment was not continued, the likelihood of its recurrence would be greater. One physician testified that if the home life of the deceased was perfectly happy, his financial condition good, and he was otherwise happy, his depressive melancholia, in the opinion of the witness, was not caused by syphilis. There is medical testimony in the record that the wounds in the body of the deceased could not have been self-inflicted in given sequences; for instance, the gashes in the throat could not have been inflicted with the belt around it. There was testimony by the embalmer that any wound he saw on the body could have been self-inflicted. There was medical testimony that in the opinion of the witness the three bruises on the head of the deceased could not have been self-inflicted. There was medical testimony that a man who had a happy married life, was in good financial condition, having no worries, and nothing to make him unhappy, would not suddenly, without any indication or suggestion in any form, go madly, raving crazy without premonitory, external symptoms, from neuro-syphilis.

L. L. Folsom testified that on the morning of Mr. Ittner's disappearance he telephoned Ittner to find if Ittner wished some tile unloaded. Ittner said he had already told the witness to order the tile, but that the tile had not been ordered because witness did not

have any of the specifications. Ittner then told him he would see him in McRae. Witness sued the bonding company and Mrs. Ittner for the balance of the money due on his contract with Ittner, which suit was settled by the bonding company. The autopsy performed on the body was concerned solely with the fracture of the jaw. There was no examination of the viscera for poison. No investigation was made by the authorities with the view of apprehending any one for the death. No reward was offered for evidence of foul play, or for the apprehension and conviction of the perpetrator. There is testimony in the record by the foreman of the coroner's jury, to the effect that there was no stab wound in the back of the neck of the deceased.

Giving to the evidence the construction most favorable to Mrs. Ittner, it is even then very doubtful whether the theory of murder is as reasonable as that of suicide. The theories of injury by automobile and accidental injury, outside of murder, are out of the question. The principal contention of counsel for the defendant in error is that a murderer planted the evidence to make the alleged murder appear to be a suicide. Among other difficulties arising from this contention comes the question whether the deceased might not have committed suicide and endeavored to make it appear to be murder. I do not intimate that this is true, but it is as feasible as that the death was a result of murder. If Ittner was murdered, he was evidently murdered by one who knew of his previous attempt to take his life and the manner in which he did it. Yet there is not one iota of evidence as to how an outsider obtained the information. There is no evidence of any motive for murder. No investigation was made, no reward was offered, nothing done whatever to bring to justice the fiend—for he would have been a fiend to have perpetrated such an act. No tracks were found around the automobile to indicate the presence of another person. There was no evidence to authorize a logical inference that there was any scuffling in the swamps. All the trampled or mashed grass and undergrowth could easily have been caused by Mr. Ittner's falling, lying down, and crawling. It would seem that if a murderer was intent on making the death look like suicide, he would not have placed the razor in a place which, as counsel contend, made it resemble murder. The razor might have been thrown down by the deceased and later the log might have been kicked

or moved over it, as *one witness made the significant statement that one could tell that the log had been moved out of its old seat in the swamp.* The deceased could have killed himself by choking in the manner shown by the evidence. If he so attempted, his falling on: the stave would have held the belt tight, and made impossible a resuscitation such as would have occurred if the attempt had been by hand. There is very slight evidence of Mr. Ittner's state of mind. *There is no evidence of lack of financial troubles.* Symptoms of melancholia and despondency could easily have been manifested in spite of the meager testimony on the subject. Mr. Ittner had a contagious disease and had attempted suicide on a previous occasion. There was no evidence that he received treatment which would have cured his disease. Dr. Hilsman, his family physician, swore that he had never treated Ittner for the disease; but he did not swear that he ever examined him for it or that he did not have it.

The evidence is too long to warrant a further detailed discussion. The evidence offered against suicide is not inconsistent with it. The purpose of this much discussion is to show that, assuming for the sake of argument that the theory of murder is at all reasonable, it can not be said to be more reasonable than suicide. It is true that some of the witnesses swore that in their opinion Ittner could not have inflicted the wounds on himself. Some of the doctors swore that in their opinion he could not have inflicted the wounds which made bruises on his face. They overlooked the possibility of his falling against logs and trees in his feeble and weakened condition, if such was the case. There was no conflict in the evidence which would make the solution of this puzzle a question for a jury. It must be decided on a question of law. Where proved facts give equal support to each of two inconsistent inferences, neither is established, and judgment must go against the party on whom rests the necessity of sustaining one of them against the other. *Hanover Fire Insurance Co.* v. *Pruitt,* 59 *Ga. App.* 777, 781 (2 S. E. 2d, 123) ; Pa. R. Co. v. Chamberlain, 288 U. S. 333 and cit. (53 Sup. Ct. 391, 77 L. ed. 819) ; United States Fidelity & Guaranty Co. v. Des Moines National Bank, 145 Fed. 273; Patton v. Texas & Pacific R. Co., 179 U. S. 658 (21 Sup. Ct. 275, 45 L. ed. 361) ; Grosvenor v. Fidelity & Casualty Co., 102 Neb. 629 (168 N. W. 596) ; Wheelock v. Freiwald, 66 Fed. 2d, 694, and cit. ;

Fort Smith Gas Co. *v.* Cloud, 75 Fed. 2d, 413 (97 A. L. R. 833);
9 Wigmore on Evidence §§ 2495(a), (b); Smith *v.* First National
Bank of Westfield, 99 Mass. 605 (97 Am. D. 59); Watkins *v.* Pru-
dential Insurance Co., 315 Pa. 497 (173 Atl. 644, 95 A. L. R.
869 (3)); *Georgia Railway & Electric Co.* v. *Harris,* 1 *Ga. App.*
714 (57 S. E. 1076); *Federal Reserve Bank of Atlanta* v. *Haynie,*
46 *Ga. App.* 522 (168 S. E. 112); *Taylor* v. *State,* 44 *Ga. App.*
387 (161 S. E. 793); *Matthews* v. *Gulf Life Insurance Co.,* 64
*Ga. App.* 112 (12 S. E. 2d, 202); Jefferson Standard Life Insur-
ance Co. *v.* Clemmer, 79 Fed. (2d,) 724 (103 A. L. R. 171). The
plaintiff failed to sustain her case, and in my opinion the judgment
should be reversed.

There is an obiter dictum in the former decision in this case,
hereinbefore referred to, to the effect that a jury may consider and
give weight to the facts out of which the presumption against sui-
cide springs, *after the presumption has been removed,* in arriving
at a verdict. The same statement has been made in a great many
other cases in connection with such a question as this court was
discussing in its former opinion. It had no relevancy on the ques-
tion being decided, and on further study I have concluded that it
was unwarranted. In Watkins *v.* Prudential Insurance Co., supra,
the court said: "Presumptions arise as follows: they are either
(1) a procedural expedient, or (2) a rule of proof production
based upon the comparative availability of material evidence to
the respective parties, or (3) a conclusion firmly based upon the
generally known results of wide human experience, or (4)' a com-
bination of (1) and (3). The presumption as to the survivor-
ship of husband and wife meeting death in a common disaster is
a procedural expedient. It is not based upon extensive data aris-
ing from human experience. An unexplained absence for seven
years raises the presumption of death of the absentee upon the
expiration of the last day of the period. This also is a procedural
expedient—an arbitrary but necessary rule for the solution of
problems arising from unexplained absences of human beings. An
example of (2) is the rule requiring persons on trial for doing
certain acts which are illegal if done without a license to produce
evidence that they belong to the class privileged by the license.
See Com. *v.* Wenzel, 24 Pa. Super. Ct. 467. The following are ex-
amples of (3): (a) An envelope properly addressed and stamped

will reach the addressee if the latter is alive; (b) a child born during the wedlock of its parents is legitimate; (c) a person who drives across a railroad crossing will use due care. If the driver is killed at such a crossing, the presumption that he showed due care shifts the burden of proof to the party who defends the action on the ground of the victim's want of care. (In this example, the presumption of the victim's due care is merely the converse of the statement that the burden of proof rests on the asserter of the victim's negligence.) A presumption that a debt is paid after a lapse of a definite long period of time is both a procedural expedient (1) and a conclusion based on the results of wide human experience (3). The so-called 'presumption against suicide' is neither a procedural expedient (1) nor a rule rooted in the consideration that one of the litigants has possession of the most available evidence determinative of the issue trying (2), nor is it a conclusion based on the known results of wide human experience (3). It is merely a permissible consideration of the nonprobability of death by suicide."

Upon consideration it will be seen that the presumption against suicide does not owe its existence to facts having evidential value. What most people do or do not do has no bearing whatever on whether one particular individual committed suicide or was killed accidentally. The effect of such a presumption is the inference that one was killed accidentally, when a violent death is proved and there is no evidence whatever from which a jury could arrive at an explanation of how it occurred. When evidence appears from which suicide may be inferred, we have held in this case that such an inference may no longer be permitted because the whimsical and illusory presumption can not be allowed to play a part in the light of the facts. We also held that such an inference is not permissible when there is evidence *from which two theories of death may be found*. In the light of these rulings, to say that when the presumption has vanished a jury may still infer, from the fact of the love of life, imbedded in the depths of most humans, that the death was accidental, in spite of evidence authorizing a finding of suicide, is the same thing as authorizing the presumption in the first place where no facts appear from which an intelligent finding can be made. That most people love life too well to destroy it is not a fact *about the deceased* from which the pre-

sumption springs. That he was a human being is not such a fact. The presumption is "merely a permissible consideration of the non-probability of death by suicide." The saying that even though a presumption has been removed a jury may consider the facts out of which it sprang arose from a consideration of *facts having some evidentiary value* and which gave rise to particular presumptions. For instance, the presumption that one who has been absent and unheard of for seven years is dead vanishes on proof that when he departed he stated an intention to remain away for ten years, but the fact that he has been absent and unheard of for over seven years may be considered with other facts in the case in determining whether he is dead. But *these are evidential facts about the party himself, and possess probative value.* Such a statement can not logically be made with reference to the presumption against suicide and the basic facts on which it is founded. If a jury is authorized or empowered to consider the basic facts of love of life and improbability of suicide in arriving at a verdict in cases where the presumption does not apply, they will have the power to apply the presumption despite its supposed disappearance, and can decide that any suicide is accidental, or use the facts of love of life and improbability of suicide to throw the weight of the evidence to the theory of accident. The only time this can be done, as we have held in this case, is when *there is no evidence as to the cause of the death.*

In Jefferson Standard Life Insurance Co. *v.* Clemmer, supra, the court said: "Ordinarily it is not necessary to refer to the presumption against suicide in the charge to the jury. If the basic fact of death by violence is admitted, or proved, the presumption arises, and in the absence of countervailing evidence, the judge should direct a verdict for the plaintiff. If such evidence is produced, the judge should charge the jury in the usual fashion. He may of course refer in his discretion to the improbability of suicide as an inference of fact, based on the common experience of mankind, but the jury should be permitted to give the inference such weight as it deems best, *undisturbed by the thought that the inference has some sort of artificial probative force which must influence their deliberation.* Likewise, as to the opposing evidence. the jury should be instructed to weigh its credibility and effect in the usual way, and finally, upon the whole evidence, to determine

whether death by accident has occurred, bearing in mind that if the evidence leaves their minds in such doubt that they are unable to decide the point, the verdict should be against the party upon whom the persuasion rests." (Italics mine.)

In my opinion it was error to admit in evidence a certified copy of the certificate of death of the insured and proofs of loss submitted to the company, having attached a copy of the death certificate which contained a copy of the verdict of a coroner's jury finding that the insured came to his death from hands of unknown parties, over the objection that the certificate included matter not provided for by the Code, § 88-1214, and that it was prejudicial and without probative value. Such a verdict is without probative value in a case like this, as against the insurance company. *Smalls* v. *State,* 101 *Ga.* 570 (28 S. E. 981, 40 L. R. A. 369); *Central Railroad* v. *Moore,* 61 *Ga.* 151; *Supreme Council of the Royal Arcanum* v. *Quarles,* 23 *Ga. App.* 104 (97 S. E. 557); Morton *v.* Equitable Life Insurance Co., 218 Iowa, 846 (254 N. W. 325, 96 A. L. R. 315); *Haugabrooks* v. *Metropolitan Life Insurance Co.,* 63 *Ga. App.* 829 (12 S. E. 2d, 163). If such a verdict alone is harmful to the insurer, it would seem that it would be if included in some other document where it had no place. The statement in the *Quarles* case, supra, to the effect that such a verdict might be received in evidence as a part of the proof of death, was obiter dictum and contrary to what was actually adjudicated in that case.